**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

Plaintiff,

vs.

MARK D. PAPERMASTER,

Defendant.

---

No. 08-cv-9078 (KMK)

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

Evan R. Chesler
Stephen S. Madsen
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business
Machines Corporation*

# Table of Contents

Table of Authorities.................................................................................................................................... ii

Introduction.................................................................................................................................................1

Statement of Facts.......................................................................................................................................1

    A.     IBM ..................................................................................................................................2

    B.     Mr. Papermaster ..........................................................................................................2

    C.     Mr. Papermaster's Noncompetition Agreement.........................................................4

    D.     Mr. Papermaster's Decision to Resign His Position at IBM and Join Apple............5

    E.     IBM's Efforts to Persuade Mr. Papermaster to Continue His Employment
            with the Company or, at Least, to Comply with His Contractual
            Obligations ....................................................................................................................7

Argument......................................................................................................................................................8

I.     IBM Will Suffer Irreparable Injury Absent Injunctive Relief....................................................8

    A.     A Breach of the Noncompetition Covenants Will Cause IBM Irreparable
            Injury. ............................................................................................................................8

    B.     A Breach of the Nonsolicitation Covenants Will Cause IBM Irreparable
            Injury. ..........................................................................................................................11

II.    IBM Is Likely to Prevail on the Merits.....................................................................................11

    A.     The Covenants Are Reasonable..................................................................................12

    B.     The Noncompetition Covenants Protect Legitimate Interests of IBM. ...................15

III.   Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the
       Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor................................15

Conclusion .................................................................................................................................................17

# Table of Authorities

Page(s)

**Cases**

Alside Dev. of Associated Materials Inc. v. Leclair,
743 N.Y.S.2d 898 (3d Dep't 2002) ................................................................................................13

Battenkill Veterinary Equine P.C. v. Cangelosi,
768 N.Y.S.2d 504 (3d Dep't 2003) ...............................................................................................13

Bus. Intelligence Servs. v. Hudson,
580 F. Supp. 1068 (S.D.N.Y. 1984) .............................................................................................13

CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.,
804 N.Y.S.2d 549 (N.Y.S. Ct. 2006) ...........................................................................................11

Estee Lauder Cos. v. Batra,
430 F. Supp. 2d 158 (S.D.N.Y. 2006).................................................................................... passim

FMC Corp. v. Taiwan Tainan Giant Indus. Co.,
730 F.2d 61 (2d Cir. 1984) .............................................................................................................9

Global Switching Inc. v. Kasper,
No. 06-cv-412, 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006)............................................................11

Green Party of N.Y. v. N.Y. State Bd. of Elections,
389 F.3d 411 (2d Cir. 2004) ...........................................................................................................8

N. Atl. Instruments, Inc. v. Haber,
188 F.3d 38 (2d Cir. 1999) .......................................................................................................9, 10

Natsource LLC v. Paribello,
151 F. Supp. 2d 465 (S.D.N.Y. 2001)...........................................................................................12

Payment Alliance Int'l v. Ferreira,
530 F. Supp. 2d 447 (S.D.N.Y. 2007).................................................................................10, 13, 14

Pontone v. York Group, Inc.,
No. 08-cv-6314-WHP, 2008 WL 4539488 (S.D.N.Y. Oct. 10, 2008) ...............................................13

Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,
118 F.3d 955 (2d Cir. 1997) ...........................................................................................................9

Ticor Title Ins. Co. v. Cohen,
173 F.3d 63 (2d Cir. 1999) .......................................................................................................9, 12

Urban Archaeology Ltd. v. Dencorp Invs., Inc.,
783 N.Y.S.2d 330 (1st Dep't 2004)...............................................................................................11

# Table of Authorities, con't.

Page(s)

*Zerman v. Ball,*
735 F.2d 15 (2d Cir. 1984) ....................................................................................................9


**Statutes & Rules**

Fed. R. Civ. P. 65 ..................................................................................................................1


**Other Authorities**

17A C.J.S. Contract § 266 ....................................................................................................13

Pursuant to Federal Rule of Civil Procedure 65, plaintiff International Business Machines Corporation ("IBM" or "the Company") respectfully submits this memorandum of law in support of its motion for preliminary injunction.

## Introduction

One of the Company's senior executives, Mark D. Papermaster, recently announced his intention to leave the Company and join a competitor of IBM, Apple Inc. ("Apple"). Mr. Papermaster is bound by a Noncompetition Agreement that sets forth certain noncompetition and nonsolicitation covenants that are reasonable in scope, duration (one year and two years, respectively) and geographical coverage. Moreover, based on his long tenure with IBM and his membership in a select group comprised of the Company's top executives, Mr. Papermaster is in possession of confidential information whose dissemination to or use by a competitor such as Apple would inflict upon IBM irreparable harm. Despite the Company's best efforts to persuade Mr. Papermaster to continue his employment with IBM, he has indicated that his departure for Apple is imminent, and he also rejected IBM's offer to receive one year's worth of compensation in exchange for his compliance with the Noncompetition Agreement.

Faced with the imminent breach of the Noncompetition Agreement, and with the irreparable harm of having its trade secrets and other highly confidential information exposed to a competitor, IBM has filed suit to enforce the Agreement. IBM now seeks a preliminary injunction compelling Mr. Papermaster to honor his contractual obligations.

## Statement of Facts

A detailed statement of the facts material to IBM's motion is set forth in the accompanying declarations of Rodney C. Adkins ("Adkins Decl.") and J. Randall MacDonald

- 1 -

("MacDonald Decl."). For the Court's convenience, the most salient facts are briefly set forth below.

## A. IBM

IBM is one of the world's largest technology companies, employing nearly 400,000 employees around the world. IBM is a globally integrated enterprise that targets the intersection of technology and effective business. (Adkins Decl. ¶ 3.) Among other things, and of particular importance here, using its proprietary "Power"-based technology and other confidential know-how, IBM designs and manufactures a variety of microelectronic devices, including microprocessors and servers, suitable for many applications. (Id.)

Like most technology companies, IBM relies on trade secrets and confidential information for much of its business. (Id. ¶ 16.) Each year, IBM spends billions of dollars and dedicates extensive efforts to the development of technological innovations and know-how, which IBM incorporates in its current product offerings and its extensive product pipeline. (Id. ¶ 14.)

## B. Mr. Papermaster

Mr. Papermaster is a highly-regarded executive at IBM. He joined the Company 26 years ago and has since ascended through the ranks to his current position, Vice President of Blade Technology.[1] (Adkins Decl. ¶ 7; MacDonald Decl. ¶ 5.) Over the course of his career with IBM, Mr. Papermaster has acquired extensive experience in the field of microprocessor and server design and manufacture. In particular, Mr. Papermaster is thoroughly familiar with highly confidential information regarding methods and processes that IBM uses to design and manufacture its microprocessors, incorporate those microprocessors in servers and create

---

[1] A "blade" is a small server. A "server" is a high performance computer designed to support computing applications of multiple, concurrent users.

technology systems, for both large and small business enterprises, based on both IBM and non-IBM architectures. (Adkins Decl. ¶ 12.)

In 2006, in recognition of his value to the Company, Mr. Papermaster was selected to serve on IBM's Integration & Values Team ("I&VT"). The I&VT, formerly known as the Senior Leadership Team, is a select group of executives consisting of approximately 300 senior leaders of IBM's worldwide business. (MacDonald Decl. ¶ 4.) The I&VT serves as a vehicle for preparing the top talent at IBM to one day become IBM's most senior management, and for challenging those individuals to become actively involved in developing the strategic and technical direction of the Company. (*Id.* ¶¶ 4, 6-7 .) The I&VT includes among its members all current senior management of IBM. (*Id.* ¶ 4.) The prestige and responsibilities associated with serving on the I&VT are reflected in the compensation of I&VT members. (*Id.* ¶ 5.)

To broaden their understanding of the Company as a whole and become familiar with the most important issues, strategic choices and competitive challenges that IBM faces on a daily basis, I&VT members are exposed to highly confidential information regarding IBM's business enterprise as a whole. (*Id.* ¶¶ 4, 6-8.) The purpose behind such exposure is to allow the Company's emerging leaders to gain an understanding of all areas of IBM's business and thereby develop corporate strategy, drive innovation and growth and address Company-wide issues through collaboration across departments and groups. (*Id.* ¶ 6.) Among the highly confidential information with which I&VT members become acquainted on a regular basis are strategic plans, marketing plans, information regarding long-term business opportunities and information regarding the development status of specific IBM products, as well as extensive assessments of the competitive landscape of the industries in which IBM competes. (*Id.* ¶ 7.)

In addition to his membership on the I&VT, Mr. Papermaster also serves on the Technical Leadership Team (TLT"), a group composed of IBM's top technical leaders and which

works to attract, develop and retain the most talented and diverse technical workforce possible. (*Id.* ¶ 11.) As a member of that team, Mr. Papermaster has gained significant knowledge of IBM's technical talent "pipeline," technical organizational capabilities and technical recruitment strategies. (*Id.*) These matters are vital to IBM's corporate strategy, and IBM considers them highly confidential. (*Id.*)

### C. Mr. Papermaster's Noncompetition Agreement

In June 2006, in connection with his employment at IBM, and as a condition of his membership on the I&VT, Mr. Papermaster agreed to a Noncompetition Agreement. (MacDonald Decl. Ex. 1.) In that agreement, Mr. Papermaster agreed that

> "during [his] employment with IBM and for one (1) year following the termination of [his] employment . . . . [he] will not directly or indirectly within the 'Restricted Area' (i) 'Engage in or Associate with' (a) any 'Business Enterprise' or (b) any significant competitor or major competitor of the Company."

(MacDonald Decl. Ex. 1, Noncompetition Agreement § 1(b).) In the Noncompetition Agreement, "Restricted Area" is defined as "any geographic area in the world for which you had job responsibilities during the last twelve (12) months of your employment with the Company." (*Id.* § 2(d).) The term "Engage in or Associate with" is defined to include "engagement or association as . . . [an] associate, employee, member, consultant, contractor or otherwise." (*Id.* § 2(c).) Finally, "Business Enterprise" is defined as "any entity that engages in . . . competition with the business units or divisions of the Company in which you worked at any time during the two (2) year period prior to the termination of your employment." (*Id.* § 2(a).)

Mr. Papermaster also agreed to nonsolicitation covenants, more specifically that

> "during [his] employment with IBM and for one (1) year following the termination of [his] employment . . . . [he] will not directly or indirectly within the 'Restricted Area' . . . solicit, for

- 4 -

competitive business purposes, any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with the Company."; and

"for the two (2) year period following the termination of [his] employment . . . [he] will not directly or indirectly within the 'Restricted Area,' hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company."

(*Id.* § 1(b).)

Additionally, in the Noncompetition Agreement, Mr. Papermaster made several

important acknowledgments. Among others, Mr. Papermaster expressly acknowledged that:

"[T]he business in which IBM and its affiliates . . . are engaged is intensely competitive." (*Id.* § 1(a).)

"[His] employment by IBM has required, and will continue to require, that [he] have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business." (*Id.*)

"[His] services to the Company are, and will continue to be, extraordinary, special and unique." (*Id.*)

"[T]he Company would suffer *irreparable harm* if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]." (*Id.* § 3 (emphasis added).)

"[T]he restrictions set forth in [the covenants] are reasonable as to geography, duration and scope." (*Id.*)

### D.    Mr. Papermaster's Decision to Resign His Position at IBM and Join Apple

Mr. Papermaster recently informed IBM that he had decided to resign his

employment with the Company in favor of a new position with Apple. (Adkins Decl. ¶ 15.)

Based on the limited information Mr. Papermaster shared with IBM, Mr. Papermaster would be

working very closely with Apple's CEO, Steve Jobs, as a top technical strategist for Apple. (*Id.*) Mr. Papermaster would also become a senior officer of Apple. (*Id.*)

Like IBM, Apple is a giant in the world of technology. (Adkins Decl. ¶ 17.) IBM and Apple are competitors in at least three areas: servers, personal computers and microprocessors. (*Id.*) Thus, Apple's Xserve line of servers, which are designed for workgroup and internet applications, competes with IBM's System x and BladeCenter lines of small enterprise and internet-scale computing servers. (*Id.* ¶ 18.) Although IBM sold its personal computer business to Lenovo in 2005, IBM continues to have an interest in that business through its equity investment in and alliance with Lenovo. (*Id.* ¶ 19.) Additionally, under an agreement with Lenovo, IBM continues to sell personal computers when such sales accompany services transactions. (*Id.*) IBM has generated substantial revenue from sales of personal computers in the past few years. (*Id.*) Thus, to this day, IBM and Apple continue to compete with one another in the personal computers business. (*Id.*)

In April 2008, Apple acquired P.A. Semi, a microchip design company based in California. (*Id.* ¶ 20.) Even though P.A. Semi is a licensee of IBM,[2] since at least 2006, IBM's microprocessors have competed with those of P.A. Semi. (*Id.*) For instance, in 2006, Apple, which had been using IBM's PowerPC microprocessors in its line of desktops and laptops,

---

[2] In 2004, P.A. Semi and IBM entered into a license agreement that permits P.A. Semi to use on a limited basis IBM's "Power" architecture. Upon Apple's acquisition of P.A. Semi, IBM agreed to waive the right to terminate the agreement on account of a "change of control." The P.A. Semi license, however, does not convey to P.A. Semi any confidences beyond the basic know-how needed to design a specific type of microprocessor using IBM's Power architecture. Importantly, the P.A. license was amended following Apple's acquisition of P.A. Semi, and now specifically prohibits Apple/P.A. Semi from using IBM's "Power" technology for designing and manufacturing any new lines of microprocessors and from designing *any* microprocessors for incorporation in servers or non-portable video game consoles. In addition, the P.A. Semi license does not cover all the intricate know-how that IBM uses to build microprocessors, let alone servers and systems using such microprocessors. (Adkins Decl. ¶ 24.)

considered using P.A. Semi's microprocessors instead. (*Id.*) Industry publications suggest that P.A. Semi has developed and is developing microprocessors capable of supporting video gaming applications. (*Id.* ¶ 21.) Through its sales of PowerPC microprocessors, IBM is an important participant in the video gaming business. (*Id.*) Finally, based on market intelligence, IBM believes that Apple intends to incorporate P.A. Semi microprocessors in its personal computers and handheld devices, and that Apple is contemplating developing a more comprehensive line of servers. (*Id.* ¶ 22.) Importantly, the P.A. Semi license agreement does not permit P.A. Semi and Apple to use IBM's know-how to manufacture new lines of microprocessors, let alone new microprocessors for incorporation in servers and non-portable game consoles. (*Id.* ¶ 24.)

### E. IBM's Efforts to Persuade Mr. Papermaster to Continue His Employment with the Company or, at Least, to Comply with His Contractual Obligations

On October 20, 2008, determined to encourage Mr. Papermaster to continue his long and highly promising tenure with the Company, IBM offered Mr. Papermaster a substantial increase in his compensation package. (MacDonald Decl. ¶ 15.) IBM also respectfully reminded Mr. Papermaster of the Noncompetition Agreement and informed Mr. Papermaster that the Company considered his joining Apple to be a breach of that agreement. (*Id.* ¶ 16.) In an effort to encourage Mr. Papermaster's compliance with his contractual obligations, IBM offered to pay him his salary for the 12 months during which he could not work at Apple. (*Id.*) Mr. Papermaster informed the Company that he needed time to consider the offers IBM had made him. (*Id.* ¶ 17.)

On October 21, 2008, however, Mr. Papermaster informed IBM that he would proceed with his plan to join Apple, that his last day with the Company would be October 24, 2008, and that he would begin his employment with Apple at some point next month. (*Id.* ¶ 18.)

On October 22, 2008, one day after Mr. Papermaster's resignation, IBM filed its lawsuit.

## Argument

Before a court may issue a preliminary injunction, the movant must show (1) that it will suffer irreparable injury absent such relief; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in movant's favor. *Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (internal citations omitted).

Because IBM readily meets that burden, provisional injunctive relief is appropriate.

## I.     IBM Will Suffer Irreparable Injury Absent Injunctive Relief.

Mr. Papermaster's imminent breach of the Noncompetition Agreement will cause IBM irreparable harm.

### A.     A Breach of the Noncompetition Covenants Will Cause IBM Irreparable Injury.

In the Noncompetition Agreement, Mr. Papermaster acknowledged, among other things, that

> "[his] employment by IBM has required, and will continue to require, that [Mr. Papermaster] have access to, and knowledge of, confidential information of the Company, including, but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business."

(MacDonald Decl. Ex. 1, Noncompetition Agreement § 1(a).)  Mr. Papermaster further acknowledged that IBM would "suffer *irreparable harm*" if he failed to comply with the

Noncompetition Agreement. (*Id.* § 3 (emphasis added).) Those important acknowledgments in the agreement Mr. Papermaster is seeking to breach are entitled to significant weight, and fully support an award of injunctive relief. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

Indeed, where, as here, the plaintiff faces a danger of trade secret misappropriation, irreparable harm—the type of harm that cannot be remedied by a money damages award—may be properly presumed.[3] *Estee Lauder*, 430 F. Supp. 2d at 174. That is because "a trade secret once lost is, of course, lost forever," and such a loss "cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam). *See also Estee Lauder*, 430 F. Supp. 2d at 174 (explaining that if plaintiff's competitor "does misappropriate [plaintiff's] trade secrets, it would be 'very difficult to calculate the monetary damages that would successfully redress the loss'") (quoting *Ticor Title Ins.*, 173 F.3d at 69).

There is no question that Mr. Papermaster is in possession of IBM's trade secrets and confidential information. New York law recognizes that "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner of such secrets] an opportunity to obtain an advantage over competitors who do not know or use it," may qualify as a trade secret or otherwise be entitled to protection. *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997). Generally, New York courts consider several factors in determining whether information constitutes a trade secret, including: (1) the

---

[3] The Noncompetition Agreement contains a choice of law clause, which provides that the agreement "shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of law rules." (MacDonald Decl. Ex. 1, Noncompetition Agreement § 13.) Because IBM is a New York corporation whose global headquarters are also located in the State of New York, that choice of law provision should be enforced. *See Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984).

extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *N. Atl. Instruments*, 188 F.3d at 44.

    The type of information in Mr. Papermaster's possession, the disclosure of which IBM seeks to prevent, bears the hallmarks of a trade secret. That information is not known outside of IBM's business, nor is it subject to the license between P.A. Semi/Apple and IBM. (Adkins Decl. ¶¶ 14, 24; MacDonald Decl. ¶¶ 10-11.) Even within IBM, sensitive technical know-how with which Mr. Papermaster is very familiar is not extensively disseminated, and is disclosed only on a need-to-know basis. (Adkins Decl. ¶¶ 12, 14.) Similarly, the sensitive information that is made available to I&VT and TLT members is carefully safeguarded. (MacDonald Decl. ¶¶ 10-11.) The information at issue is highly valuable to IBM, and perhaps even more so to the companies with which IBM competes. (Adkins Decl. ¶¶ 14, 16; MacDonald Decl. ¶¶ 10-12, 19.) IBM has spent extraordinary resources to develop that information; indeed, it has built its entire business around it. (Adkins Decl. ¶ 14; MacDonald Decl. ¶¶ 10-11.) And IBM's competitors could not replicate the information at issue from public sources. (Adkins Decl. ¶¶ 14, 25; MacDonald Decl. ¶¶ 10-11.) There is thus no question that the information whose dissemination IBM seeks to preclude qualifies as a trade secret. Not surprisingly, such information has routinely been afforded protection by New York courts. *See Payment Alliance Int'l v. Ferreira*, 530 F. Supp. 2d 447, 479 (S.D.N.Y. 2007) (granting trade secrets protection to information acquired from employer's technical and information technology personnel with whom the departing employee worked closely); *Estee Lauder*, 430 F. Supp. 2d at 176 (affording

protection to information regarding confidential brand strategies, confidential pipeline products, planned products innovations and stage of development of pipeline products).

**B.     A Breach of the Nonsolicitation Covenants Will Cause IBM Irreparable Injury.**

While Mr. Papermaster will suffer no harm from his performance of the nonsolicitation covenants, a breach of those covenants will undoubtedly cause IBM irreparable injury. As New York courts have recognized, "generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Global Switching Inc. v. Kasper*, No. 06-cv-412, 2006 WL 1800001, at \*12 (E.D.N.Y. Jun. 28, 2006) (citations omitted).

Similarly, "the violation of a non-compete by the solicitation of employees . . . constitutes irreparable harm." *Id. See also CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549, 562 (N.Y.S. Ct. 2006) ("[t]he loss of key employees constitutes irreparable harm as a matter of law"); *Urban Archaeology Ltd. v. Dencorp Invs., Inc.*, 783 N.Y.S.2d 330, 336 (1st Dep't 2004). That is particularly true here. The prospect of other IBM employees leaving at Mr. Papermaster's instigation raises the specter of a continuing leakage of IBM's trade secrets and confidential information to competitors.

And, as noted, Mr. Papermaster has already acknowledged that a breach of the entire Noncompetition Agreement will cause IBM irreparable harm. (MacDonald Decl. Ex. 1, Noncompetition Agreement § 3.)

**II.     IBM Is Likely to Prevail on the Merits.**

IBM is also highly likely to prevail on the merits of its claims for specific performance of the Noncompetition Agreement.

Under New York law, an employer seeking to enforce an agreement that restricts an employee's future activities must prove that the agreement in question is reasonable with

- 11 -

respect to duration and geographical area. *Ticor Title Ins.*, 173 F.3d at 69. Where the agreement includes a noncompetition covenant, the plaintiff must also show that enforcement of it is necessary either to (1) prevent an ex-employee from disclosing trade secrets or confidential information to the employer's competitors or (2) to stop an employee with special, unique, or extraordinary skills from working for a competitor to the detriment of the initial employer. *Id.* at 70; *see also Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469-70 (S.D.N.Y. 2001). In determining whether a restrictive covenant is reasonable, the court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Ticor Title Ins.*, 173 F.3d at 69.

As set forth below, the Noncompetition Agreement is fully enforceable because its covenants are reasonable in scope and serve to protect vital interests of IBM, while their performance imposes no meaningful hardship on Mr. Papermaster.

## A. The Covenants Are Reasonable.

Under New York law, "there are no per se lines demarcating what constitutes an unreasonable durational or geographic scope." *Estee Lauder*, 430 F. Supp. 2d at 180.

The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable." *Id.* As explained in the MacDonald and Adkins declarations, the trade secrets and IBM-confidential information that Mr. Papermaster has in his possession are extensive, and the value of such information extends far beyond the one-year duration of the noncompetition covenants. (Adkins Decl. ¶ 14; MacDonald Decl. ¶ 10.) For that reason, the duration of the noncompetition covenants (12 months) is reasonable. The duration of the client nonsolicitation covenant (12 months) is similarly reasonable, since IBM will need a substantial amount of time to groom a new business executive to assume Mr. Papermaster's responsibilities. (*Id.* ¶ 19.)

Finally, given the irreparable hardship that would be inflicted upon IBM by additional

defections of extraordinary talent (*id.*), the duration of the employee nonsolicitation covenant

(24 months) is reasonable as well. Notably, duration restrictions of between one and three years

have routinely been upheld as reasonable. *E.g.*, *Payment Alliance Int'l*, 530 F. Supp. 2d at 485

(upholding 2-year covenant); *Alside Dev. of Associated Materials Inc. v. Leclair*, 743 N.Y.S.2d 898,

898-99 (3d Dep't 2002) (upholding 2-year covenant); *Battenkill Veterinary Equine P.C. v. Cangelosi*,

768 N.Y.S.2d 504, 505-06 (3d Dep't 2003) (upholding 3-year covenant); *Pontone v. York Group,*

*Inc.*, No. 08-cv-6314-WHP, 2008 WL 4539488, at *5 (S.D.N.Y. Oct. 10, 2008) (upholding 3-year

covenant in the context of a sale of a business).

   The geographical restrictions of the covenants, which preclude Mr. Papermaster

from working for a competitor or soliciting clients within "any geographic area in the world for

which [he] had job responsibilities during the last twelve (12) months of [his] employment"

(MacDonald Decl. Ex. 1, Noncompetition Agreement § 2(d)), are reasonable as well. It is well

established that "[a]rea limitations are reasonable if restricted to the area in which the employee

was engaged in the course of his or her employment." 17A C.J.S. Contract § 266. Where

warranted by the nature and scope of the employer's business, broad geographical limitations,

even worldwide, have been deemed reasonable. *Estee Lauder*, 430 F. Supp. 2d at 181 (upholding

worldwide limitation); *Bus. Intelligence Servs. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984)

(upholding worldwide limitation).

   The balance struck in the Noncompetition Agreement between IBM's interest in

protecting its trade secrets and Mr. Papermaster's right to pursue employment opportunities of

his choosing is also reasonable. On the one hand, the disclosure of IBM trade secrets and other

highly confidential information will cause IBM irreparable harm, as will the potential loss of

valuable employees and clients. (*See supra* Section I.) On the other hand, if he is ordered to

comply with the terms of the Noncompetition Agreement, Mr. Papermaster will suffer no cognizable hardship. His performance of the nonsolicitation covenants will cause Mr. Papermaster no conceivable harm. Compliance with the noncompetition covenants similarly causes no hardship to Mr. Papermaster because, over the course of his 26-year career at IBM, Mr. Papermaster has received substantial compensation (MacDonald Decl. ¶ 15) and, during the one-year term of the noncompetition covenant, Mr. Papermaster is free to work for a company that is not a competitor of IBM. *Payment Alliance Int'l*, 530 F. Supp. 2d at 485 ("[I]t is undisputed that [the employee] was compensated in advance by [the employer] for his assuming the terms of the employment agreement. Further, this is not a case where the enforcement of the non-compete clause precludes the defendant from all gainful employment within an industry.").

And even if Mr. Papermaster's assured livelihood over the next 12 months were not so plainly evident, IBM has offered to pay Mr. Papermaster his current base salary (which is substantial) in the event Mr. Papermaster agrees to refrain from competing with IBM for one year (MacDonald Decl. ¶ 16), after which Mr. Papermaster can resume employment for any company he wishes to work for, Apple included, provided that he respects his other obligations under the law and the Noncompetition Agreement. IBM's offer, which goes far beyond what the law requires IBM to do,[4] rebuts any argument that Mr. Papermaster will suffer any financial hardship during the 12 months of the noncompete covenant. *Estee Lauder*, 430 F. Supp. at 182 ("Here, the risk of [the employee's] loss of livelihood is entirely mitigated by the fact that Estee Lauder will continue to pay [the employee] his salary . . . for the duration of the 'sitting out' period.").

---

[4] *See Payment Alliance Int'l*, 530 F. Supp. 2d at 485 (rejecting an employee's argument that a noncompetition covenant was "unreasonable because it fails to provide for payment of [the employee's] salary during the two year non compete period").

Accordingly, the covenants set forth in the Noncompetition Agreement are reasonable, as Mr. Papermaster acknowledged in that agreement. (MacDonald Decl. Ex. 1, Noncompetition Agreement § 3 ("[T]he restrictions set forth in Paragraph 1 are reasonable as to geography, duration and scope").)

### B.    The Noncompetition Covenants Protect Legitimate Interests of IBM.

As set forth above, enforcement of the covenants is needed because there is a real danger that IBM's trade secrets and confidential information will be exposed to a competitor. (*See supra* Section I.) Furthermore, Mr. Papermaster's 26-year career at IBM and his membership in the exclusive I&VT have conferred upon him unique or special abilities (Adkins Decl. ¶¶ 10-13), as Mr. Papermaster acknowledged in the Noncompetition Agreement. (MacDonald Decl. Ex. 1, Noncompetition Agreement § 1(a)(iv) ("[B]y your training, experience and expertise, your services to the Company are, and will continue to be, extraordinary, special and unique").)

*    *    *

In sum, IBM has established that it is likely to prevail on the merits of its claims for specific performance of the Noncompetition Agreement.

### III.    Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor.

As set forth above, IBM has demonstrated that it is entitled to an order preliminarily enjoining Mr. Papermaster from violating the terms of the Noncompetition Agreement because (1) breach thereof will cause IBM irreparable harm; and (2) IBM is likely to prevail on the merits of its claim for specific performance.

Even if the Court were not satisfied that IBM is likely to prevail on the merits, IBM has at a minimum raised sufficiently serious questions going to the merits of the dispute.

Because there is no question that the balance of hardships tips decidedly in IBM's favor (*see supra* at 14-15), preliminary injunctive relief is appropriate. *See Estee Lauder,* 430 F. Supp. 2d at 182.

## Conclusion

For the reasons set forth above, IBM respectfully requests that the Court issue a preliminary injunction enforcing the Noncompetition Agreement.

October 24, 2008

CRAVATH, SWAINE & MOORE LLP

by

Evan R. Chesler
(EChesler@Cravath.com)
Stephen S. Madsen
(SMadsen@Cravath.com)
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business Machines Corporation*