## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>MARK D. PAPERMASTER, )<br><br>Defendant. ) | Case No.: 08-CV-9078 (KMK) |

## DEFENDANT MARK D. PAPERMASTER'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Blair G. Connelly
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
(212) 906-1200

Dockets.Justia.com

# Table of Contents

**INTRODUCTION** .................................................................................................. 1

**STATEMENT OF FACTS** ................................................................................... 2

   A.   IBM And Apple Are Not Competitors ............................................................ 2

   B.   While At IBM, Mr. Papermaster Was A Technical Manager Focusing On Server Microprocessors Designed For Business Applications, Not Consumer Products ......................................................................................... 3

   C.   In 2007 Apple Began Searching For A Possible Successor To The Executive Responsible For Development Of Its iPod and iPhone Products ........... 5

   D.   In October 2008 Apple Offered Mr. Papermaster A Senior Position Overseeing The Development Of iPods and iPhones ............................................. 7

   E.   After Mr. Papermaster Informed IBM That He Was Taking A Job At Apple, IBM Allowed Him To Remain On The Job With Unfettered Access To IBM's Files ........................................................................... 8

   F.   Mr. Papermaster Will Suffer Severe Hardship If IBM's Motion is Granted ....... 10

**IBM HAS NOT SHOWN IT IS ENTITLED TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY INJUNCTION** ....................................... 11

   I.   IBM Has Not Shown That It Will Suffer Irreparable Harm As A Result Of Mr. Papermaster Working On Development Of iPods And iPhones At Apple ........................................................................... 11

   II.   IBM Has Not Shown That It Is Likely To Succeed On The Merits ........... 17

      A.   Mr. Papermaster Will Not Be Working For A "Business Enterprise" .................................................................................. 18

      B.   IBM Has Not Shown It Is Likely To Succeed On Its Claim That Mr. Papermaster Will Work For A "Significant" Or "Major" Competitor ......................................................................... 21

      C.   The NonCompetition Agreement Is Unenforceably Overbroad In Its Temporal and Geographic Scope ...................... 21

      D.   IBM Has Not Shown A Likelihood Of Success On The Nonsoliciation Provision Either ....................................................... 23

   III.   IBM Has Not Shown That The Balance Of The Hardships Is Decidedly In Its Favor .................................................................... 23

**CONCLUSION** .................................................................................................. 25

## Table of Authorities

**CASES**

**PAGE(S)**

*AM Medica Commc'ns Group v. Kilgallen,*
    261 F. Supp. 2d 258 (S.D.N.Y. 2003), *aff'd* 90 Fed. Appx. 10 (2d Cir. 2003) ..... 13, 20

*Advance Biofactures Corp. v. Greenberg,*
    103 A.D.2d 834 (2d Dep't 1984) ................................................................. 17

*America Institute of Chemical Engineers v. Reber-Friel Co.,*
    682 F.2d 382 (2d Cir. 1982) ....................................................................... 17

*Baker's Aid v. Hussman Foodservice Co.,*
    830 F.2d 13 (2d Cir. 1987) ......................................................................... 13

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382, 389 (1999)) .................................................................. 18, 23

*Bell & Howell: Mamiya Co. v. Masel Co. Cor.,*
    719 F.2d 42 (2d Cir. 1983) ......................................................................... 11

*Brennan's, Inc. v. Brennan's Restaurant,*
    360 F.3d 125 (3d Cir. 2004) ....................................................................... 11

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) ....................................................................... 26

*Columbia Ribbon & Carbon Manufacturing Co., Inc. v. A-1-A Corp.,*
    42 N.Y.2d 496 (1977) .................................................................... 19, 22, 23

*Doninger v. Niehoff,*
    527 F.3d 41 (2d Cir. 2008) ......................................................................... 24

*Earthweb, Inc. v. Schlack,*
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) ................................................... Passim

*Estee Lauder Cos. v. Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ................................... 11, 14, 15, 26

*GFI Brokers, LLC v. Santana,*
    2008 U.S. Dist. LEXIS 59219 (S.D.N.Y. Aug. 6, 2008) ...................... 19, 20

*Greenwich Mills Co. v. Barrie House Coffee Co.,*
    91 A.D.2d 398 (2d Dep't 1983) ................................................................. 22

*Hanson Trust PLC v. SCM Corp.*,
    774 F.2d 47 (2d Cir. 1985) ...................................................................... 11

*International Creative Management, Inc. v. Abate*,
    2007 U.S. Dist. LEXIS 22964 (S.D.N.Y. Mar. 28, 2007) ...................... 12, 13

*Ivy Maritime Co., Inc. v. C.R. Seasons Ltd.*,
    907 F. Supp. 547 (E.D.N.Y. 1995) ...................................................... 22, 24

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990)) .................................................................. 12

*Karpinski v. Ingrasci*,
    28 N.Y.2d 45 (1971) ............................................................................. 19

*Matthias v. Jacobs*,
    167 F. Supp. 2d 606 (S.D.N.Y. 2001) ................................................... 18

*National Committee Associate v. AT&T Co.*,
    813 F. Supp. 259 (S.D.N.Y. 1993) ........................................................ 23

*Paco Sport, Ltd. v. Paco Rabanne*,
    112 F.3d 504 (2d Cir. 1997) ................................................................. 26

*Patton v. Dole*,
    806 F.2d 24 (2d Cir. 1986) ................................................................... 11

*Payment Alliance International, Inc. v. Ferreira*,
    530 F. Supp. 2d 477 (S.D.N.Y. 2007) ......................................... 14, 15, 18

*Pella Windows & Doors v. Buscarena*,
    2007 U.S. Dist. LEXIS 52382 (E.D.N.Y. July 19, 2007) ......................... 24

*Reed, Roberts Associates, Inc. v. Strauman*,
    40 N.Y.2d 303 (1976) ...................................................................... 17, 22

*Reuters Ltd. v. United Press International Inc.*,
    903 F.2d 904 (2d Cir. 1990) ................................................................. 11

*Silipos, Inc. v. Bickel*,
    2006 U.S. Dist. LEXIS 54946 (S.D.N.Y. Aug. 8, 2006) ......................... 20

*Ticor Title Insurance Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) ............................................................... 19, 20

Defendant Mark D. Papermaster respectfully submits this memorandum in opposition to the motion for preliminary injunction by International Business Machines Corporation ("IBM").

## INTRODUCTION

After 26 years at IBM working on large, complex computer servers designed for business use, Mark Papermaster has now been given a once-in-a-lifetime opportunity to do something completely different: oversee the development of iPods and iPhones at Apple. That job has nothing to do with the work Mr. Papermaster did at IBM: it involves entirely different technology and design concerns. Apple hired Mr. Papermaster not because of any specific knowledge or experience he gained at IBM, but for his general skill as an engineer and his strong management skills, knowing full well that he will need to learn the iPod and iPhone technology "on the job." Nothing about his new role will implicate any trade secrets of IBM.

Apple and IBM are not even competitors: IBM's business is focused on large "enterprise" applications for businesses, whereas Apple's is based on consumer electronics. Indeed, after Mr. Papermaster informed IBM that he had accepted a job at Apple, IBM <u>allowed him to continue working at IBM for two entire weeks, with unfettered access to all of his files and to IBM's entire computer network</u> – hardly what one would expect when an executive is leaving for a competitor. Given its conduct, IBM's claim that it will suffer irreparable harm or hardship due to "inevitable disclosure" of "trade secrets" is absurd.

Nor can IBM show a likelihood of success on the merits. Noncompetition agreements are judicially disfavored, and IBM's form agreement – which are signed by literally hundreds of allegedly "unique" employees according to IBM – is demonstrably overbroad and unenforceable. Finally, Mr. Papermaster will suffer severe hardship if he loses his dream job and is forced out of the rapidly-changing electronics industry for a year. The motion should be denied.

## STATEMENT OF FACTS

The pertinent facts are set forth in the accompanying declarations of Mark Papermaster, Robert Mansfield, and Danielle Lambert; below is a summary for the Court's convenience.

### A.    IBM And Apple Are Not Competitors

IBM is a global technology company that provides specialized products and services to its business customers. IBM does not design, manufacture or market consumer electronic products, having sold its personal computer business to Lenovo in 2005. Instead, IBM focuses on high-performance business systems such as information technology infrastructure, servers and information storage products, and operating systems software. (Papermaster Decl. ¶ 13.) As IBM's most recent 10-K declares: "The PC era has ended, representing a fundamental shift in the technology requirements of the company's clients." (Connelly Decl. Ex. B.)

Apple's primary business is the design, manufacture and marketing of consumer electronic products, which include personal computers (Macs), portable digital music players (iPods), and mobile communications devices (iPhones). (Connelly Decl., Apple's Form 10K, Ex. A.) Apple also sells a variety of products that are compatible with those consumer electronic products, including application software, printers, storage devices, speakers, headphones and various other accessories. (Mansfield Decl. ¶ 2; Lambert Decl. ¶ 2.) In contrast to IBM, Apple "believes that the personal computer has become the center of an evolving digital lifestyle." (Connelly Decl. Ex. A.)[1]

In a 2004 interview, IBM Chairman and CEO Sam Palmisano made clear that IBM was focused on the business, or "enterprise" market and _not_ consumer electronics:

---

[1]  The only Apple product that even arguably overlaps with IBM's product line is Apple's top of the line Xserve, which represents a small portion of Apple's business and provides approximately        of Apple's revenues. (Mansfield Decl. ¶ 3.)

**REDACTED**

We are enterprise. We used to be in retail, we were in retail PC. ...We are enterprise. We [make] no bones of what we are, we know what we are. We are the leading company in the enterprise. ... Why enterprise? Faster growing than the other segments [including] consumer. ... <u>Strategically I don't think you can do both</u>. I know other companies think you can. They think you can learn in consumer electronics and music downloading and exploit. I mean, I listen to it...it's so different. <u>The business model is so different</u>. I don't know how you can do that. I'm not saying it's wrong; I just don't know how you execute it.... <u>It's not even close.</u>

(Connelly Decl. Ex. C.) (emphasis added)

## B. While At IBM, Mr. Papermaster Was A Technical Manager Focusing On Server Microprocessors Designed For Business Applications, Not Consumer Products

Mr. Papermaster graduated from college in 1982 with a bachelor's degree in electrical engineering, and immediately went to work at IBM. (Papermaster Decl. ¶ 2.) As Mr. Papermaster's career progressed, he became a product development manager and later a product development executive, earning a strong reputation for his ability to lead large teams on complex projects. He is not, however, himself an inventor of technology. (Papermaster Decl. ¶ 3.)

For the past 17 years, virtually all of Mr. Papermaster's work at IBM has involved server technology and systems. A server is a computer dedicated to providing one or more services over a computer network. Servers are not consumer products; they are used to manage large networks and to run critical business operations. (Papermaster Decl. ¶ 4.) At the time he resigned, Mr. Papermaster had been IBM's Vice President of Blade Development, within the System and Technology group, since October 2006. A blade server is a server chassis housing multiple thin, modular electronic circuit boards, known as server blades. (Papermaster Decl. ¶ 6.)

From 1991 until 2006, Mr. Papermaster worked in microprocessor technology development. Microprocessors are the heart of any computer – they are integrated circuits that contain the entire central processing unit for a computing device. There are three common

categories for microprocessor applications: (1) business enterprise applications such as servers; (2) personal computing and gaming; and (3) microprocessors "embedded" in other machines, such as automobiles, telephones, and appliances. Each category requires a different design with different capability, power consumption, and circuit techniques. (Papermaster Decl. ¶ 7.)

The process to create the microprocessors embedded in consumer electronics is very different from the process of creating server or personal computing microprocessors. For devices such as the iPod and the iPhone, the microprocessor must be both highly compact and highly energy efficient, so as to accommodate the small size of the device and the fact that it runs on a battery. In particular, these embedded microprocessors must have a low leakage level – they cannot "bleed" energy when not in use – so that the consumer does not have to constantly recharge the battery. Server microprocessors, by contrast, are typically used in large business environments with an ample power supply, and thus have no such constraints. The goal in designing server microprocessors is to obtain the fastest and most powerful microprocessor possible, without the concerns present in consumer electronic microprocessors regarding size or power use. (Mansfield Decl. ¶ 7.) All of Mr. Papermaster's experience at IBM regarding the development of microprocessors involved server microprocessors, save for two exceptions involving applications for both servers and personal computing. (Papermaster Decl. ¶ 7.)

Starting in 2006, Mr. Papermaster became one of approximately 300 members of IBM's Integration & Values Team ("I&VT"). When he joined, Mr. Papermaster (like the other 300 members) was asked to execute a form Noncompetition Agreement. (Papermaster Decl. ¶ 11.) The I&VT members are selected by the Chairman to foster company-wide teamwork and integration. During his time at IBM, Mr. Papermaster attended exactly four I&VT meetings: an orientation session when he first became a member, and each of the three annual meetings.

(Papermaster Decl. ¶ 8.) Mr. Papermaster does not believe he learned any trade secret information that would be useful to him or Apple by participating in I&VT and, in fact, recalls reviewing materials relating to any meeting only once. (Papermaster Decl. ¶ 10.)

Mr. Papermaster was also a member of IBM's Technical Leadership Team ("TLT") since 2004. The TLT focuses on areas of specific expertise needed within the company, and undertakes initiatives to grow IBM's skills and leadership diversity. The TLT does not serve a recruiting function, which is instead handled locally. Accordingly, the TLT was very specific to IBM's business – which as discussed above, is focused on business applications. There are approximately 50 members of the TLT. The TLT met three times a year for one day each, and sometimes the meetings were conducted by phone. Mr. Papermaster does not believe that he learned any trade secret information that would be useful to him or Apple as a result of his participation on the TLT. (Papermaster Decl. ¶ 12.)

**C.    In 2007 Apple Began Searching For A Possible Successor To The Executive Responsible For Development Of Its iPod And iPhone Products**

In October 2007, Apple began a search for an executive in the consumer electronics field to serve under the current Senior Vice President, iPod Division, and who could eventually be the successor in that role. Apple interviewed numerous candidates with consumer electronics backgrounds, but it was unable to find a suitable replacement. (Lambert Decl. ¶ 5.)

Unable to find someone with specific experience in consumer electronics, Apple instead searched for someone who had a strong background in technology and engineering in general, who also had strong managerial skills and would fit within Apple's culture. Apple has previously had success with this approach. To that end, Apple contacted Robert Mansfield, who joined Apple in 1999 and currently runs engineering of its Mac product line, which includes the development of laptops. Mr. Mansfield had no experience developing consumer electronics

before working at Apple, but his overall technical knowledge, and his strong managerial skills, made him successful in developing Apple's laptop programs. (Lambert Decl. ¶ 6.)

At Apple's request, Mr. Mansfield provided a list of eight candidates who fit the desired profile. (Lambert Decl. ¶ 6.) One was Mark Papermaster. (Mansfield Decl. ¶ 11; Lambert Decl. ¶ 6.) Mr. Mansfield had known Mr. Papermaster since college, and believed that, while he lacked a technical background in consumer electronics, he possessed the strong managerial skills and broad based technical knowledge. (Mansfield Decl. ¶ 11.)

Apple first contacted Mr. Papermaster in late January 2008 about a potential executive job opening. While Mr. Papermaster was satisfied with his work at IBM as a Vice President, the potential opportunity to work in a senior leadership position at Apple was interesting to him. Mr. Papermaster would not have even considered working for an IBM competitor, but he did not view Apple as one. (Papermaster Decl. ¶ 16.) In February 2008, Mr. Papermaster traveled to Apple's corporate headquarters in Cupertino, California, where he met with Apple CEO Steve Jobs and certain Apple Senior Vice Presidents, including the current head of the iPod/iPhone division. Apple did not describe the position at this time, but indicated that the position involved product development for consumer electronics. (Papermaster Decl. ¶ 17.)

Due in part to Mr. Papermaster's lack of experience in consumer electronics, Apple senior management concluded that Mr. Papermaster was better suited to developing hardware for products in the area of personal computers. Apple approached Mr. Papermaster about a possible position in that area, but Mr. Papermaster stated that the position was not the right fit for him and he declined to pursue it. (Lambert Decl. ¶ 10.)

**D.** **In October 2008 Apple Offered Mr. Papermaster A Senior Position Overseeing The Development Of iPods and iPhones**

In September 2008 (after the release of the new iPhone and iPods over the prior few months), Apple reinstituted and intensified its efforts to find a successor for the senior executive for the iPod/iPhone development team. (Lambert Decl. ¶ 11.)

In late September 2008, Apple again contacted Mr. Papermaster. On October 7, 2008, Mr. Papermaster met again with Mr. Jobs and the head of product development for iPod and iPhone, as well as additional Senior Vice Presidents. Apple told Mr. Papermaster that the current Senior Vice President, iPod Division was leaving his position, and that they were looking for someone to replace him. Mr. Papermaster told Apple that he had just been informed that he would soon be changing positions at IBM, and that he did not want to accept a new position at IBM and then leave IBM shortly thereafter. Accordingly, Apple asked Mr. Papermaster to extend his trip so they could complete the interview process promptly. Apple set up additional meetings that took place on October 8, 2008. On Friday, October 10, 2008, Apple offered Mr. Papermaster a job as Senior Vice President, Devices Hardware Engineering. (Papermaster Decl. ¶ 18.) Mr. Papermaster accepted immediately. (Lambert Decl. ¶ 13.) Apple asked Mr. Papermaster to keep the offer confidential until the reorganization involving the current head of product development for iPod and iPhone was made public. (Papermaster Decl. ¶ 18.)

IBM has claimed three areas of purported competition between the companies: (1) personal computers; (2) microprocessors; and (3) servers. Mr. Papermaster was not hired to work in any of these areas. (Papermaster Decl. ¶ 20; Mansfield Decl. ¶ 13.) Mr. Papermaster's role at Apple will be to manage the development of consumer electronic products – specifically, the iPod and iPhone. That job will not require him to draw upon any confidential information that he may have learned at IBM: his career there was devoted to managing the development of

high performance server technology utilized by businesses, which requires a vastly different sort of technology. Nor will Mr. Papermaster's position at Apple require him to use any of the supposedly confidential information that he (and the many other similarly-situated employees) may have learned at IBM through his membership in the I&VT or the TLT, or to solicit any customer or employee of IBM. (Papermaster Decl. ¶ 22.)

IBM has also expressed a concern that Mr. Papermaster was hired to work on P.A. Semi microprocessor design (P.A. Semi is a company that Apple acquired in April 2008). This is unfounded: Mr. Papermaster was hired to lead the iPod and iPhone development teams. Apple acquires the microprocessors used in those products from an outside vendor. The group acquired from P.A. Semi is managed by Mr. Mansfield, and it is not part of the group that Mr. Papermaster was hired to lead. **REDACTED**

(Mansfield Decl. ¶ 14.) Finally, although IBM is not a competitor to Apple, and Apple hired Mr. Papermaster to work on areas entirely unrelated to his work at IBM, Mr. Papermaster was asked to sign (and did sign) an Intellectual Property Agreement ("IPA") prohibiting him from disclosing to Apple any confidential information he gained while working at IBM. (Lambert ¶ 15; Papermaster ¶ 23.)

**E.    After Mr. Papermaster Informed IBM That He Was Taking A Job At Apple, IBM Allowed Him To Remain On The Job With Unfettered Access To IBM's Files**

On October 13, 2008, Mr. Papermaster informed his direct supervisor, Doug Balog, that he would be resigning and accepting a position with Apple that would start in November 2008. Mr. Papermaster made clear that, while he was not at liberty to disclose the specifics of his new job, he had made up his mind and was not interested in any counter-offer from IBM. Mr. Papermaster also told Mr. Balog that he was willing to continue working at IBM for two weeks to facilitate the transition. (Papermaster Decl. ¶ 25.)

Later that evening, Mr. Papermaster spoke with Rodney Adkins, an IBM Senior Vice President. Mr. Adkins told Mr. Papermaster that he suspected the position had to do with P.A. Semi. Mr. Papermaster stated that he could not tell him the specific position because of Apple's confidentiality concerns, but Mr. Papermaster assured him that it was important to him that he not work for a competitor. At no point during this call did Mr. Adkins disagree with Mr. Papermaster or indicate that he viewed Apple as a competitor. (Papermaster Decl. ¶ 25.)

IBM did not tell Mr. Papermaster to stop coming to work or clean out his desk. Nor did IBM cut off Mr. Papermaster's computer access or ask him to return its files. Rather, Mr. Papermaster continued to come to the office and perform his duties. (Papermaster Decl. ¶ 29.)

On October 20, 2008, Mr. Papermaster received a call from Randall MacDonald, IBM's Senior Vice President of Human Resources. (Papermaster Decl. ¶ 27.) Notwithstanding Mr. Papermaster's repeated insistence that he had made up his mind and was not looking for a counter-offer, Mr. MacDonald presented him with one. (Papermaster Decl. ¶¶ 25-27.) Mr. MacDonald also told Mr. Papermaster that he believed that Mr. Papermaster's acceptance of an offer with Apple would violate the Noncompetition Agreement. Mr. MacDonald further told Mr. Papermaster that if he did not accept the counter-offer, IBM would pay him his base salary to "sit out" for a year. Mr. MacDonald asked Mr. Papermaster to consider his decision and the effect it would have on his family. (Papermaster Decl. ¶ 27.)

On October 21, 2008, Mr. Papermaster sent a memo to Mr. Balog and Mr. Adkins confirming that as he had discussed with them over the prior week, he would be leaving IBM for an opportunity in consumer electronic products with Apple. He also informed them that he was confident that the position is not competitive with IBM and that he intended to adhere to all of his agreements with IBM. Mr. Papermaster also informed Mr. MacDonald that he would

continue working to help with the transition. Mr. MacDonald told Mr. Papermaster that he understood and that "the light would always be on" for him at IBM. Mr. MacDonald told Mr. Papermaster that although a departing executive would normally leave immediately, he understood from Mr. Adkins that Mr. Papermaster had the highest integrity and that he was confident that Mr. Papermaster would appropriately handle any intellectual property. Mr. MacDonald told Mr. Papermaster that he could continue to work through October 24, 2008 to manage the transition. (Papermaster Decl. ¶ 28.) Mr. Papermaster thus continued to come to the office and perform his job duties, with unfettered access to all of his files and to IBM's computer network. Indeed, Mr. Papermaster was specifically authorized to contact IBM customers. (Papermaster Decl. ¶ 29.)

Mr. Papermaster left IBM on October 24, 2008. He took only textbooks and memorabilia. He left both his primary computer with files intact, and his desk files, keeping only personnel documents such as personal benefits and stock information. No one from IBM watched Mr. Papermaster clear out his office or escorted him out of the building. (Papermaster Decl. ¶ 30.) IBM did, however, block the sale of his vested restricted stock units ("RSUs") and stock options. (Papermaster Decl. ¶ 31.)

**F.     Mr. Papermaster Will Suffer Severe Hardship If IBM's Motion is Granted**

The job at Apple is a once in a lifetime opportunity for Mr. Papermaster. He will be reporting directly to CEO Steve Jobs and heading up the development of some of the most innovative and successful consumer electronics devices on the market. He will also have significantly more responsibility than he had at IBM and will be better compensated. (Papermaster Decl. ¶ 19.) If Mr. Papermaster is forced to "sit out" of the electronics industry, he will not be able to find a comparable position in a year – indeed, it is questionable whether a truly "comparable" position even exists. Moreover, IBM's expansive interpretation of the

Noncompetition Agreement would mean that Mr. Papermaster will not be able to work for any technology company anywhere in the world, even if his position does not compete with IBM or draw upon confidential IBM information. Given that Mr. Papermaster is an electrical engineer by education and has spent his entire career as a manager of engineers and professional technical executives, he has little chance of obtaining meaningful employment if IBM's broad interpretation of the restrictive covenant is accepted. (Papermaster Decl. ¶ 32.)

## IBM HAS NOT SHOWN IT IS ENTITLED TO THE EXTRAORDINARY REMEDY OF A PRELIMINARY INJUNCTION[2]

A preliminary injunction "is an extraordinary remedy and should not be routinely granted." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). In fact, it is "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). The moving party must demonstrate: (1) "irreparable harm" in the absence of relief and "(2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the moving party's favor." *Brennan's, Inc. v. Brennan's Rest.*, 360 F.3d 125, 129 (3d Cir. 2004).

## I. IBM Has Not Shown That It Will Suffer Irreparable Harm As A Result Of Mr. Papermaster Working On Development Of iPods And iPhones At Apple

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Reuters Ltd. v. United Press Int'l Inc.*, 903 F.2d 904, 907 (2d Cir.

---

[2] Mr. Papermaster is not waiving any defenses not presented herein, including, but limited to, lack of personal jurisdiction. There is also a serious choice of law issue in this matter because Mr. Papermaster lives in Texas and works in California, and both states hold that noncompetition agreements are unenforceable as a matter of public policy. *See Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 170-74 (S.D.N.Y. 2006). Because the lack of irreparable harm and the unenforceability of the Noncompetition Agreement is readily apparent, and due to space constraints, Mr. Papermaster has not presented those arguments herein but reserves the right to rely on them at the hearing.

1990) (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Cor.*, 719 F.2d 42, 45 (2d Cir. 1983)). The movant must show "an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages." *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (internal quotation and citation omitted). "The movant is required to establish not mere possibility of irreparable harm, but that it is '*likely* to suffer irreparable harm if equitable relief is denied." *Int'l Creative Mgmt., Inc. v. Abate*, 2007 U.S. Dist. LEXIS 22964, at *8 (S.D.N.Y. Mar. 28, 2007) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)) (emphasis in original). "'Likelihood sets, of course, a higher standard than 'possibility.'" *Id.* (quoting *JSG Trading Corp.*, 917 F.2d at 79). "If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied." *Earthweb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999).

IBM's claim of irreparable harm is belied by its own conduct. IBM admits that Mr. Papermaster advised it of his decision to go to Apple on October 13, 2008. (MacDonald Decl. ¶ 13.) Yet after he did so, IBM did not tell Mr. Papermaster to clean out his office. (Papermaster Decl. ¶ 28-29.) IBM did not ask Mr. Papermaster to turn in his keys and stay home. IBM did not ask Mr. Papermaster to turn in his company laptop or his blackberry. IBM did not cut off Mr. Papermaster's access to IBM's computer network. IBM did not ask Mr. Papermaster to return any files he might have had at home. (*Id.*) Instead, IBM allowed Mr. Papermaster to continue performing his job duties <u>for two entire weeks</u> – all the while with full, unfettered access to all of his hard copy and electronic files, and all of the so-called "trade secrets" that IBM <u>now</u> claims require the extraordinary remedy of a preliminary injunction. IBM's claim should be rejected for this reason alone. *See Int'l Creative Mgmt., Inc.*, 2007 U.S. Dist. LEXIS

22964, at *15-17 (rejecting claim of irreparable harm where plaintiff had allowed the employee to obtain the allegedly "confidential and proprietary information" after he had left the company).

Moreover, none of the three grounds that IBM cites in support of its claim is sufficient to satisfy its burden of showing irreparable harm. First, IBM argues that its form non-competition agreement (signed by all 300 members of the I&VT) "acknowledges" that there would be irreparable harm in the event of a breach. (Pl.'s Mem. at 5.) That is plainly insufficient: a plaintiff "cannot rely on the contract provision alone to demonstrate irreparable harm." *Int'l Creative Mgmt., Inc.*, 2007 U.S. Dist. LEXIS 22964, at *19; *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate.") The Noncompetition Agreement carries even less weight because it is part of a form contract presented to literally hundreds of employees, rather than an individually-negotiated agreement. To accept IBM's position would mean that all of the hundreds of employees who agree to those standard terms "are unique and extraordinary and that any material breach by any of those employees of his or her employment contract necessarily will harm [IBM] irreparably." *Int'l Creative Mgmt., Inc.*, 2007 U.S. Dist. LEXIS 22964, at *21. "Such a finding is internally inconsistent and runs contrary to the sort of case-by-case analysis courts engage in" to determine such matters, and would "also be liable to lead to absurd results." *Id.*; *see AM Medica Commc'ns Group v. Kilgallen*, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003) (denying preliminary injunction and noting that employee "signed a pre-printed form contract"), *aff'd* 90 Fed. Appx. 10 (2d Cir. 2003).

Second, IBM argues that it will suffer irreparable harm because it "faces a *danger* of trade secret misappropriation." (Pl.'s Mem. at 9) (emphasis added.) IBM does not assert that

any trade secrets have *actually* been misappropriated. Nor does IBM explain exactly *how* such misappropriation would take place, given the significant differences between IBM's business (focused on large-scale machines for businesses) and Apple's business (focused on consumer-oriented electronics). More fundamentally, IBM does not explain how there can be any such "danger" given the significant differences between the type of work Mr. Papermaster did at IBM (involving server technology for large business networks) and the type of work he will do at Apple (developing iPods and iPhones).

The cases IBM cites in support of its claim are readily distinguishable. In *Estee Lauder*, *supra*, the court found irreparable harm where the employee sought employment "with a direct competitor of [the plaintiff]." In that case, the employee had been the Global General Brand Manager for the plaintiff, and left to become Worldwide General Manager of a company that made products "in direct competition with" the very products for which the employee had been responsible. *Estee Lauder*, 430 F. Supp. 2d at 166 (noting that the new company's products were "closely competitive with [the plaintiff's product] in terms of price point," and that both brands "offer exclusive, clinical products that are sold for similar prices."). The court noted that the plaintiff "would face much greater difficulty carrying its burden of demonstrating irreparable injury" if its products did not compete with the new company's products.[3] *Id.* at 176.

Similarly, in *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477 (S.D.N.Y. 2007), the court granted a preliminary injunction only after finding that the employee was going to work for "a direct competitor" in a similar job. *Id.* at 482. The court observed that where the

---

[3] The court also rested its decision in part on the employee's breach of his duties to Estee Lauder while still an employee, and his overall lack of credibility. *Estee Lauder*, 430 F. Supp. 2d at 164-65. In this case, no one has even suggested that Mr. Papermaster has anything but the highest integrity.

plaintiff seeks to prove irreparable harm based on a theory of "inevitable disclosure," the factors to be considered include:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Id.* In *Payment Alliance*, it was "undisputed that [the new employer] is a direct competitor of [the old employer]," and it was also "undisputed that [the employee's] employment at [the new employer] will be in a similar capacity" to his former job. *Id.* at 482. Only on those facts did the court find a risk "that disclosure of PAI's trade secrets is inevitable."

The facts here stand in marked contrast to those in *Estee Lauder* and *Payment Alliance*, and indeed the factors described in those cases weigh <u>against</u> a finding of irreparable harm. First, "the extent to which [Apple] is a direct competitor of [IBM]" is negligible to non-existent: Apple's business is focused on consumer electronics such as PCs, iPods and iPhones. (Mansfield Decl. ¶ 2.) IBM's business is focused on large-scale computer operations for businesses. (Connelly Decl. Ex. B.) Second, far from being "nearly identical" to his position at IBM, Mr. Papermaster's position at Apple will involve a completely different kind of product using different technology that Mr. Papermaster will have to learn on the job. (Papermaster Decl. ¶ 20; Mansfield Decl. ¶ 13.) It would be absurd to suggest that Mr. Papermaster "could not reasonably be expected to fulfill his new job responsibilities" regarding iPods and iPhones "without utilizing the trade secrets of his former employer" regarding servers. Third, the "extent to which" Mr. Papermaster's knowledge of IBM's server technology "would be valuable to" Apple is minimal at best: only a small part of Apple's operations involve servers, and Mr. Papermaster is not a part of those operations. As noted above, IBM's CEO has stated that "the

business model is so different" in the consumer electronics world and that "it's not even close." Finally, "the nature of the industry" -- the fast-paced, rapidly-changing world of electronics and computing -- further militates against a finding of irreparable harm.

The *Earthweb* decision is instructive. In that case, Earthweb sought to prevent its former employee from going to work at an alleged competitor based on a form non-competition agreement and a risk of "inevitable disclosure" of its trade secrets. *Earthweb*, 71 F. Supp. 2d at 308-309. The employee, who had been a vice president responsible for the content on Earthweb's websites, left to join a new company, ITworld.com, that was to provide news, product information and editorial opinions for IT professionals. *Id.* at 305-06. Earthweb argued that the employee was one of its most important executives, and that by virtue of his job, the employee had obtained extensive knowledge of "trade secrets" regarding (1) strategic content planning, (2) licensing agreements and acquisitions, (3) advertising, and (4) technical knowledge. *Id.* at 303. Earthweb argued that because of this knowledge, the employee would "inevitably disclose" its trade secrets during his employment at ITWorld.com.

The court denied Earthweb's motion. The court first noted that the inevitable disclosure doctrine "treads an exceedingly narrow path through judicially disfavored territory," and that "[a]bsent evidence of actual misappropriation, the doctrine should be applied in only the rarest of cases." *Id.* at 310. The court found that even if the plaintiff had shown that the employee "is aware of information that could be afforded trade secret protection," it had not shown "an imminent and inevitable risk of disclosure warranting preliminary relief" because of differences between both the businesses and the jobs, "even though both companies will target the IT market." *Id.* at 316. In particular, the court noted that ITworld.com intended "to generate the bulk of its content in-house," which "sets it apart from Earthweb in important ways." *Id.* The

Court further noted that the employee's position at ITworld.com "will simply not involve matters involving licensing, subscription pricing or acquisitions," which were the areas Earthweb had identified as trade secrets. *Id.* at 316. Based on those facts, the court found "no imminent risk that [the employee] will disclose or use Earthweb's trade secrets in connection with his employment at ITworld.com." *Id.*

The same conclusion applies here. Although both IBM and Apple are technology companies, that is where the similarity ends. Whatever knowledge Mr. Papermaster has regarding the high-end, business-centered servers that IBM manufactures will be of no use to Apple, and certainly will not be used in Mr. Papermaster's new position developing iPods and iPhones. Mr. Papermaster was not hired because of any specific knowledge or expertise regarding IBM's products, but rather for his general technical and managerial skills and his perceived ability to fit within Apple's culture. That IBM will lose the benefit of a skilled technician and manager does not constitute "irreparable harm," and does not provide a basis for the draconian relief that IBM seeks. *Earthweb*, 71 F. Supp. 2d at 316 ("[W]hile [the employee's] experience . . . may prove useful in his position at [the new company] or elsewhere, 'an employee may not be restrained from using the general techniques learned during his [former] employment.'") (quoting *Advance Biofactures Corp. v. Greenberg*, 103 A.D.2d 834, 836 (2d Dep't 1984)).

## II.    IBM Has Not Shown That It Is Likely To Succeed On The Merits

Noncompetition agreements are "rigorously examined" because of "the general policy favoring robust and uninhibited competition" and "the powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Am. Inst. of Chem. Engineers v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982); *see also Reed, Roberts Assocs., Inc. v.*

*Strauman*, 40 N.Y.2d 303, 307 (1976). Noncompetition agreements are "subject to more exacting scrutiny ...[because] [p]ublic policy favors competition and individual liberty and seeks to shield employees from the superior bargaining position of employers." *Matthias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001). Accordingly, they are "'enforceable only to the extent that they satisfy the overriding requirement of reasonableness.'" *Payment Alliance Int'l, Inc.*, 530 F. Supp. 2d at 484 (quoting *Reed, Roberts Assocs.*, 40 N.Y.2d at 306). "A restrictive covenant in an employment contract is reasonable only if it: (1) is no greater than is required for the protection of a legitimate interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public." *Id.* (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999)).

IBM's form Noncompetition Agreement purports to restrict Mr. Papermaster from: (1) engaging or associating with any "Business Enterprise"; or (2) engaging or associating with "any significant competitor or major competitor" of IBM. (Papermaster Decl. Ex. 1, § 1(b).) As discussed below, IBM has not shown that it is likely to succeed on the merits because (1) the definition of "Business Enterprise" is unreasonably overbroad, (2) Mr. Papermaster will not be working for a competitor of IBM, let alone a "significant" or "major" competitor, and (3) the Noncompetition Agreement is unreasonably overbroad in its temporal and geographic scope.

## A.    Mr. Papermaster Will Not Be Working For A "Business Enterprise"

IBM's form Noncompetition Agreement defines "Business Enterprise" as "any entity that engages in, or owns or controls a significant interest in any entity that engages in, competition with the business units or divisions of the Company in which [Mr. Papermaster] worked during the two (2) year period prior to the termination of [his] employment." (Papermaster Decl. Ex. 1, § 2(a)) (emphasis added). The business unit in which Mr. Papermaster was employed for the last

two years was the Systems and Technology Group, in which he was Vice President of Blade Development. (Papermaster Decl. at ¶ 6.) IBM claims that Apple's Xserve line (which accounts for less than          of Apple's revenues) "competes" with IBM's BladeCenter line of servers. (Adkins Decl. at ¶ 18.) **REDACTED**

To be enforceable, a noncompetition clause must be "necessary" to protect the legitimate interests of an employer against unfair competition. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). This limitation is founded upon the sound policy that "it is not reasonable for a man to be excluded from a profession ... when he does not compete with his former employer by practicing it." *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 51 (1971). When the terms of a noncompetition agreement are "unrestrained by limitations keyed to uniqueness, trade secrets, confidentiality or ... competitive unfairness," the provision "does no more than baldly restrain competition," and "is too broad to be enforced as written." *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (1977).

In *GFI Brokers, LLC v. Santana*, 2008 U.S. Dist. LEXIS 59219 (S.D.N.Y. Aug. 6, 2008), a brokerage house sought to prevent a former broker from working with another brokerage house based on a noncompetition agreement prohibiting him from having "any interest in or association with" any "competitive brokerage business." *Id.* at *18. The court held that this provision "sweeps too broadly to be enforced as written" because "[i]t purports to prevent [the broker] from associating with a competitor regardless of the nature of that association." *Id.* at *29. The fatal flaw was that the provision "does not limit itself to situations where [the broker] would have an opportunity to exploit the 'information and relationships' gained from his work [with his former employer]." *Id.* Therefore, the provision prevented the broker from working for a new employer even if his employment posed no risk to his previous employer. *Id.* The court found

the agreement invalid as written. *Id.* at *29-30. Instead, the court read the noncompetition provision to prohibit only associations by the broker that actually threatened the brokerage house's interests against unfair competition. *Id.* at *31; *see also EarthWeb,* 71 F. Supp. 2d. at 312 (noncompetition clause did not bar an employee's subsequent employment because the tasks involved at his new job were different and the two companies were not competitors); *Am Medica Comm. Group v. Kilgallen,* 261 F. Supp. 2d 258, 263 (S.D.N.Y. 2003) (noncompetition agreement unenforceable because plaintiff failed to demonstrate how the employee's new job jeopardized its business interests); *Silipos, Inc. v. Bickel,* 2006 U.S. Dist. LEXIS 54946, *20 (S.D.N.Y. Aug. 8, 2006) (noncompetition agreement that prohibited employee from working for anyone "'directly or indirectly' engaged in the 'Business of the Company,'" would effectively bar employee "from the entire industry").

IBM's form Noncompetition Agreement is similarly overbroad. By its terms, it purports to restrict Mr. Papermaster from working for *any company* that "engages in competition" with his former business unit *to any extent, even if Mr. Papermaster will not be working for the part of the company that does so.* That is nothing more than a bald restraint of trade.

IBM also has not shown that Mr. Papermaster's employment at Apple will *actually* implicate his work on Blade servers. As discussed above, Mr. Papermaster's position at Apple (working on development of iPods and iPhones) has nothing to do with Blade server technology. (*See* Mansfield Decl. ¶ 13; Lambert Decl. ¶ 17; Papermaster Decl. ¶ 20.) Moreover, IBM cannot attempt to prevent Mr. Papermaster from working at Apple based on work he performed at IBM *earlier* than the last two years of his employment. (*See, e.g.,* Adkins Decl. at ¶ 10.) The Noncompetition Agreement expressly limits the scope of the restriction based on the two years before his departure. Because of the strict scrutiny applies to noncompetition agreements, an

employer is not permitted to re-write them after the fact by claiming a broader interest in its "trade secrets." *See EarthWeb*, 71 F. Supp. 2d 299, 311 (S.D.N.Y. 1999) ("[S]uch retroactive alterations distort the terms of the employment relationship and upset the balance which courts have attempted to achieve in construing non-compete agreements.")

### B.   IBM Has Not Shown It Is Likely To Succeed On Its Claim That Mr. Papermaster Will Work For A "Significant" Or "Major" Competitor

The second clause of the form Noncompetition Agreement purports to restrict Mr. Papermaster from engaging or associating with "any significant competitor or major competitor" of IBM. (Papermaster Decl. Ex. 1, § 1(b).) This provision is inapplicable because Apple and IBM are not "competitors" at all, and certainly not "significant" or "major" competitors. (*See* supra pp. 2-3.) Moreover, the provision is unenforceable for the same reasons described above. As in *GFI Brokers*, the provision impermissibly "purports to prevent [the employee] from associating with a competitor regardless of the nature of that association." *Id.* at *29.

### C.   The NonCompetition Agreement Is Unenforceably Overbroad In Its Temporal and Geographic Scope

A noncompetition agreement may not be enforced if it imposes an unreasonably lengthy restriction. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69-70 (2d Cir. 1999). Whether a temporal restriction is reasonable depends on the facts and circumstances of the particular case, including the nature of the industry and the type of work done by the employee. *See EarthWeb, Inc.*, 71 F. Supp. 2d at 313. In this case, the Noncompetition Agreement purports to impose a one-year restriction. In the world of technology, that constitutes an eternity. *Id.* (one-year restriction was deemed too lengthy in the "Internet advertising industry" because due to "the speed with which [the industry] apparently changes, defendants' knowledge ... will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before

the year is up.'") (quotation and citation omitted); (*See* Papermaster Decl. ¶ 32.)  To take Mr.

Papermaster "out of the game" for that long would be a crippling blow to his career.  New York

courts do not enforce such onerous terms.  *See, e.g., Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499-500 (1977).

A noncompetition agreement must also be reasonable in its geographic scope.  *Reed Roberts, Assocs., Inc.*, 40 N.Y.2d at 307.  "The application of the rule 'depends entirely on the totality of the circumstances.'" *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 559 (E.D.N.Y. 1995) (quoting *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 401 (2d Dep't 1983)).  In *Columbia Ribbon & Carbon Mfg. Co.*, the court held unenforceable a noncompetition agreement that purported to restrict an employee from competing with his employer within any territory to which he was assigned within the last two years of his employment.  42 N.Y.2d 496, 499 (1977).  The court invalidated the agreement because it was "unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness." *Id.* at 498.

IBM's form Noncompetition Agreement attempts to prevent Mr. Papermaster from working for any companies within the "Restricted Area," which is defined as "any geographic area in the world for which you had job responsibilities during the last twelve (12) months of your employment with the Company." (Papermaster Decl. Ex. 1, ¶ 1(b).)  Although Mr. Papermaster has spent the last seventeen years working in Austin, Texas, IBM asks the court to interpret this clause to encompass the entire planet, based on "the scope of [IBM's] business." (Pl.'s Mem. at 13.)  Under IBM's approach, *any* employee who signs its form Noncompetition Agreement – including all three hundred members of IBM's I&VT – would be precluded from working *anywhere on Earth* for *any* company that competes with IBM *in any way*.  Such a clause

would be "unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness." *Columbia Ribbon* 42 N.Y.2d at 498.

### D. IBM Has Not Shown A Likelihood Of Success On The Nonsolicitation Provision Either

IBM also invokes the nonsolicitation covenant contained in the Noncompetition Agreement, which prevents Mr. Papermaster from soliciting "any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last twelve (12) months" of his employment at IBM. (Pl.'s Mem. at 4-5) (Papermaster Decl, Ex. 1, § 1(b)). There is no evidence that Mr. Papermaster has ever attempted to solicit anyone, and IBM only provides rank speculation that he ever will. That is not sufficient proof under the standards for a preliminary injunction. *See Nat'l Comm. Assoc. v. AT&T Co.*, 813 F. Supp. 259, 264 (S.D.N.Y. 1993) ("A preliminary injunction will not issue based upon remote or speculative fears.").

### III. IBM Has Not Shown That The Balance Of The Hardships Is Decidedly In Its Favor

Even if the court were to find that there are "serious questions" regarding the merits, IBM has not shown that the balance of the hardships is "decidedly in [its] favor." *See Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008). First, IBM has not shown that it will *actually* suffer any hardship at all as a result of Mr. Papermaster working on the development of iPods and iPhones. As discussed above, Mr. Papermaster's job at Apple has nothing to do with the work he did at IBM – and certainly nothing to do with the work he did for the last two years, which is all that is covered under the Noncompetition Agreement. IBM's claim of "hardship" is based entirely on its own speculation about what Mr. Papermaster *might* do at Apple – speculation that turned out to be completely wrong. IBM's claim that it will suffer hardship is also belied by its own conduct. As discussed above, IBM allowed Mr. Papermaster to continue coming to work, with full access to IBM's information, for two entire weeks <u>after</u> Mr. Papermaster informed IBM that

he was leaving for Apple. Given those undisputed facts, IBM's claim of "hardship" cannot be taken seriously.[4]

In contrast, preventing Mr. Papermaster from performing his new job would risk costing him a once in a lifetime opportunity to work on one of the most exciting, cutting-edge projects in the technological field – the Apple iPod and the iPhone. It is, put simply, a "dream job" for any engineer. New York courts recognize the importance of enhancing one's career opportunities in their balance of the hardships analysis. *See Pella Windows & Doors v. Buscarena*, 2007 U.S. Dist. LEXIS 52382, at *8 (E.D.N.Y. July 19, 2007) (holding that the balance of the hardships favored the employee because the noncompetition agreement prohibited him from working in a field that would significantly further his career); *Ivy Mar Co.*, 907 F. Supp. at 554 ("[N]o restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment.").

Similarly, forcing Mr. Papermaster to "sit out" of the electronics industry for a year would be incredibly damaging to his career. As discussed earlier, the electronics industry, particularly the consumer electronics industry, is very different from more traditional industries. It is fast-paced, highly fluid, and ever-changing to consumer demands. Apple introduced four new versions of the iPod in 2008 alone.[5] Taking Mr. Papermaster "out of the game" for such a long period would impose a severe hardship. (Papermaster Decl. ¶ 32.) And it is no answer for IBM to say that it will pay his salary during that period: he will have lost the opportunity to take a once-in-a-lifetime "dream job," he will be unable to return to IBM given the litigation, and he

---

[4] The fact that the supposedly confidential information from the IV&T and TLT is shared with literally *hundreds* of IBM employees further undermines IBM's claim.

[5] Apple introduced the iPod touch (32 GB), the iPod shuffle (2nd generation), the iPod nano (4th generation), the iPod touch (2nd generation), and the iPod classic (120 gb). *See* Identifying iPod Models, *available at:* http://support.apple.com/kb/HT1353.

will be unable to work in the technology industry, given IBM's position here, which defines "competitor" to include effectively the entire electronics world.

Finally, in weighing the equities it is appropriate for the court to consider the parties' conduct. This is the opposite of the two types of cases on which IBM relies, in which the employee absconded with confidential documents or operated surreptitiously beyond his employer's back. When Mr. Papermaster received his offer from Apple to head the iPod Division, he immediately informed his superiors. His superiors then allowed him to remain on the job, despite their knowledge that he would soon be working for Apple, and even though they had *no idea* what job he would be performing at Apple. Indeed, IBM allowed Mr. Papermaster to remain for two additional weeks precisely because they knew of his strong personal character and integrity, forged through years of service at IBM. And IBM has not even suggested that Mr. Papermaster has improperly retained any documents or electronic files. *Compare Estee Lauder*, 430 F. Supp. 2d at 164-65. *See also Paco Sport, Ltd. v. Paco Rabanne*, 112 F.3d 504 (2d Cir. 1997) (affirming district court's finding that balance of hardships did not tip decidedly in favor of employer based on employer's "failure to take any action" to prevent the infringing activities despite ample notice) (reported in full at 1997 U.S. App. LEXIS 8578 (2d Cir. Apr. 29, 2007) (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

## CONCLUSION

For the foregoing reasons, Mr. Papermaster respectfully requests that the court deny IBM's request for a preliminary injunction.

Dated: October 31, 2008

LATHAM & WATKINS LLP

By: _____
Blair G. Connelly
LATHAM & WATKINS, LLP
885 Third Avenue
New York, New York 10022-4834
(212) 906-1200

Timothy B. Hardwicke
LATHAM & WATKINS
233 South Wacker Drive
Chicago, Illinois 60606
(312) 876-7700


Attorneys for Defendant
MARK D. PAPERMASTER

NY\1466167.3