UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                              Plaintiff,

           vs.

MARK D. PAPERMASTER,

                              Defendant.

08 Civ. 9078 (KMK)

**DECLARATION OF
MARK D.
PAPERMASTER**

I, Mark D. Papermaster, declare as follows:

**Background/Career at IBM**

1.      I was an employee of International Business Machines Corporation ("IBM") for nearly 26 years, from September 13, 1982 until October 24, 2008.

2.      I am an electrical engineer by training. I graduated from the University of Texas at Austin with a Bachelors of Science degree in electrical engineering in 1982. After graduating from college, I began my career at IBM in Burlington, Vermont designing general purpose circuits for Application Specific Integrated Circuit ("ASIC") products. I later obtained a Masters of Science degree in electrical engineering in 1988 from the University of Vermont. After approximately six years in circuit design engineering roles, I accepted a management position overseeing the quality and assurance for ASIC products.

3.      In 1991, I moved to Austin, Texas to take on a circuit and physical design management role for POWER microprocessors that were being designed for IBM's UNIX servers. As I progressed in my career at IBM, I became a product development manager and later a product development executive. In each of these assignments, I leveraged my leadership

Dockets.Justia.com

capability to bring together strong technical experts to have clarity on the goals, individual roles, project management rigor, and strategic direction for the products for which we had responsibility. I developed a strong reputation in IBM for my ability to lead large teams on complex projects. I am known to have strong technology management skills to bring together technical experts and enable them to integrate on specific product developments. I am not myself, however, an inventor of technology, and, in fact, am listed as a co-inventor (with 4 others) on only a single patent, which issued more than ten years ago.

4.     For the past 17 years, virtually my entire IBM effort has involved the delivery of server technology and systems. A server is a computer dedicated to providing one or more services over a computer network. Servers are not consumer products, but rather they are used by businesses to manage large networks and to run mission critical business operations. Attached as Exhibit 1 hereto is a picture of a typical IBM server.

5.     From 1982 until 1991, I lived and worked in Burlington, Vermont while employed by IBM. In March 1991, I moved to Austin, Texas, to continue my work for IBM. I have maintained my residence in Austin, Texas, continuously since that time.

6.     I resigned from IBM effective October 24, 2008. At the time I left IBM, I was the Vice President of Blade Development, within the System and Technology group, a position that I had held since October 2006. A blade server is a server chassis housing multiple thin, modular electronic circuit boards, known as server blades. IBM introduced blade servers in 2002. Each blade is a server in its own right, often dedicated to a single application. Attached as Exhibit 2 hereto is a picture of an IBM blade server that works with the Blade Center systems. Like all servers, blade servers are not a consumer product. Rather, they allow businesses to easily add

new capacity by adding a blade, instead of buying an entirely new server. Attached as Exhibit 3 is a picture of an IBM blade chassis with 8 IBM blade servers followed by 6 empty slots. The microprocessors (described below) used in blade servers are very different than those used in consumer electronic devices. In my executive capacity, I had four technical executives and two line executives reporting to me. I provided guidance and leadership to assure clear blade product strategy and product development execution. My group did not design the microprocessor technology used in these blade servers – we procured the microprocessors from either an outside source or IBM microprocessor design groups.

7.      From 1991 until 2006, I worked in microprocessor technology development. In late 2003, I was promoted to the Vice President of Microprocessor Technology Development. Microprocessors are the heart of any computer – they are integrated circuits that contain the entire central processing unit for a computing device, which read and perform software instructions from a separate memory source. Microprocessor technology can be designed to be used in a multitude of applications. There are three common categories for microprocessor applications: (1) microprocessors for business enterprise applications such as servers; (2) microprocessors for personal computing and gaming; and (3) those "embedded" in other machines, such as automobiles, telephones, and appliances. Each of these categories drives a different design with different capability, power consumption, and circuit techniques. All of my experience with the development of microprocessors involved server microprocessors, save for two exceptions involving applications for both servers and personal computing (this was approximately from 1991-1994, and in 2004-2005). IBM employed a separate Vice President in microprocessor design to oversee IBM's microprocessor development for consumer electronics and embedded products.

8.      Starting in 2006, I became one of approximately 300 members of IBM's Integration & Values Team ("I&VT"). The I&VT members are selected by the Chairman to work to integrate IBM based on its values, and to encourage teamwork across the various IBM business segments. As such, the I&VT group's work is to better integrate IBM. During my entire time at IBM, I attended one I&VT orientation session when I first became a member. I also attended each of the three annual meetings of the I&VT group. Those meetings were held in Florida, California and Connecticut, respectively, during the first quarter of each of the three years I was a member of the I&VT group.

9.      The annual I&VT meetings are two-day sessions that include IBM's Chairman and senior officers. The meetings are high level. To the best of my recollection, each of the three annual meetings I attended began with a dinner which included opening remarks by the Chairman. The succeeding day included presenters from senior management, who discussed results in the prior year and provided a high-level review of the strategic focus for the current year. I do not recall any discussion of Apple Inc. ("Apple") at any I&VT meeting.

10.      Following the annual meetings, IBM made available online to members of I&VT materials relating to the meeting. I&VT members are asked to review the materials. Materials are not otherwise disseminated in hard copy at the meetings. To the best of my recollection, as to the January 2008 meeting, I did not download or print any of the material and, in fact, I recall reviewing the 2008 materials online only shortly after the meeting and approximately for thirty minutes only. I do not recall reviewing the online material from the 2006 and 2007 meetings. I do not believe that I learned any trade secret information that would be useful to me or Apple as a result of my participation on the I&VT.

11.    I was granted performance stock units ("PSUs") upon becoming a member of the I&VT. I estimate that the vested PSUs were worth approximately $16,323.00 as of October 21, 2008. To the best of my knowledge, I was not paid any other additional cash or equity compensation based upon my service as an I&VT member. As a member of the I&VT, I was also asked to execute a form Noncompetition Agreement. I executed this agreement in June 2006.

12.    I have also been a member of IBM's Technical Leadership Team ("TLT") since 2004. The TLT fosters the development of IBM's technical workforce. The TLT does not have a recruiting function, but rather hiring decisions are made on the local level. The TLT focuses on areas of specific expertise needed within the company, and undertakes initiatives to grow IBM's skills and leadership diversity. There are approximately 50 members of the TLT. The TLT met three times a year for one day each, and sometimes the meetings were conducted by phone. The TLT was very specific to IBM's business. I do not believe that I learned any trade secret information that would be useful to me or Apple as a result of my participation on the TLT.

### Absence of "Competition" Between IBM and Apple

13.    IBM is a global technology company that provides specialized products and services to its business customers. To the best of my knowledge, IBM does not design, manufacture or market consumer electronic products – IBM sold its personal computer business to Lenovo in 2005. Instead, IBM focuses on high-performance business systems such as information technology infrastructure, servers and information storage products, and operating systems software.

14.     Apple, on the other hand, is in the business of designing, manufacturing and marketing consumer-oriented hardware and related products. Apple's business model centers on selling its product line of personal computers, portable digital music players and mobile communications devices, along with compatible software, accessories and services, directly to consumers.

15.     Until this litigation effort by IBM, aside from the divested IBM personal computer business and a single sale several years ago of Apple's Xserve product to a university, I do not recall a single instance of Apple being described as a competitor of IBM during my entire tenure at IBM.

### Position at Apple

16.     I was first contacted by Apple in late January 2008 about a potential executive job opening. I was not looking to leave IBM at the time, and I advised the Apple recruiter that I was not interested. In a subsequent call, the recruiter disclosed that the opportunity was a key executive role in a compelling area within Apple. While I was satisfied with my work at IBM as a Vice President, the potential opportunity to work in a senior leadership position at Apple was interesting to me. I did not view Apple as a competitor of IBM and I would not consider working for an IBM competitor.

17.     In February 2008, I traveled to Apple's corporate headquarters in Cupertino, California, where I met with Apple CEO Steve Jobs and certain Apple Senior Vice Presidents, including the current head of the iPod/iPhone division. Apple did not describe the position to me at this time, but communicated that the position involved product development for consumer electronics. It seemed that the Apple executives were interested in leadership characteristics

more than technical know-how. Several weeks later, Apple contacted me and told me that the senior position was not then available, but inquired as to whether I would be interested in a less senior position in Apple portables (meaning laptops). After considering the opportunity, I informed Apple that I was not interested.

18.     In approximately late September 2008, I was again contacted by Apple. I was told that Steve Jobs wanted to meet with me again. On October 7, 2008, I met again with Mr. Jobs and the head of product development for iPod and iPhone, as well as additional Senior Vice Presidents. I was told at that time that the current Senior Vice President, iPod Division was leaving his position, and that they were looking for someone to replace him. I told Apple that I had just been informed that I would soon be changing positions at IBM. I further told Apple that I would not accept a new position at IBM and then immediately leave IBM. Based upon this information, Apple asked me to extend my trip so they could complete the interview process promptly, and they set up additional meetings on October 8, 2008, during which I met the people who would be my direct reports. On Friday, October 10, 2008, Apple offered me a job as Senior Vice President, Devices Hardware Engineering. Apple asked me to keep the offer confidential until the departure of the current head of product development for iPod and iPhone from his current position is made public. Attached hereto as Exhibit 4 hereto is a true and correct copy of my offer letter dated October 10, 2008.

19.     This is a once in a lifetime opportunity for me. I will be reporting directly to CEO Steve Jobs and heading up the development of some of the most innovative and successful consumer electronics devices on the market. I will also have significantly more responsibility than I had at IBM and will be better compensated. I believe this job will offer me unique challenges and opportunities that were simply not available at IBM.

20.     My role at Apple will be strictly limited to managing the development of consumer electronic products – specifically, the iPod and iPhone. This job will not require me to draw upon any confidential information that I may have learned at IBM. As I explained, my career at IBM was devoted to managing the development of high performance server technology utilized by businesses. This requires a vastly different technology than is used in the development of iPods and iPhones. Although I disagree that Apple and IBM are competitors, IBM has claimed in this lawsuit three areas of purported competition between the companies: (1) personal computers; (2) microprocessors; and (3) servers. Consistent with my position as the most senior product manager of the iPod and iPhone devices, it is my understanding that I will not have any responsibility for any of these areas in my new job. Moreover, I will be acting solely as a product manager – I am not being hired to develop technology across product lines.

21.     IBM's papers before the Court note that Apple acquired P.A. Semi, a microprocessor design company, and suggest that I may be employed by Apple to work with P.A. Semi "to improve the Intel-based architecture used in its personal computers, and develop new servers and systems that would compete with IBM's product offerings." That is certainly not the job I was hired for, which is limited to the iPod and the iPhone. Indeed, I have been advised by Apple that I will not be managing P.A. Semi assets in my role at Apple. It is also my understanding that I will not be responsible for developing the microprocessors that are used in iPod and iPhone products, but rather those will be procured from sources outside my group.

22.     Nor will my position at Apple require me to use of any confidential information that I may have learned in my role on the I&VT or the TLT at IBM, or to solicit any customer or employee of IBM.

23.     Indeed, when I accepted the offer at Apple, I signed an Intellectual Property Agreement in which I agreed not to disclose or bring onto Apple property any "confidential, or proprietary, or secret information" of IBM. Attached as Exhibit 5 hereto is a true and correct copy of this agreement. I was also counseled by Apple after accepting its job offer that I should be certain not to retain any IBM property or information except for matters relating to benefits and personal matters. I fully intend to abide by the Apple agreement and the Noncompetition Agreement I signed with IBM, and to protect any confidential IBM information I may have learned.

## Resignation from IBM

24.     I was very surprised that IBM filed the present lawsuit against me, as the IBM executives gave me no reason to believe that they questioned my integrity when I informed them that I would be taking a position at Apple. Indeed, I continued to fulfill my job duties for nearly two weeks after giving notice, with unfettered access to IBM's confidential information.

25.     I first informed IBM on Monday, October 13, 2008 that I would be resigning and accepting a position with Apple that would start in November 2008. I told Doug Balog, my direct report executive, in the late afternoon on that day that I had a unique offer from Apple. (I was on vacation this day attending to a planned family event, so I called Mr. Balog while traveling for this occasion.) I told Mr. Balog that I was not at liberty to provide specifics about the new job. Apple had asked me to keep the matter confidential until after the organizational changes were announced, and I complied with this request. I also told Mr. Balog that I was not looking to use the job offer to leverage more money or a better position from IBM. In this call or a call the next day, Mr. Balog asked me what my timeline was, and I told him that I would work for two weeks to facilitate the transition if IBM so desired. I also spoke with Rodney Adkins the

evening of October 13, 2008, an IBM Senior Vice President and Mr. Balog's supervisor. Mr. Adkins asked if he could change my mind, and I told him that I had made my decision. Mr. Adkins told me that he suspected the position had to do with P.A. Semi. I stated that I could not tell him the specific position because of Apple's confidentiality concerns, but assured him that it was important to me that I not work for a competitor. At no point during this call did Mr. Adkins disagree with me or indicate that he viewed Apple as a competitor. I also told Mr. Adkins that I was not using the offer to leverage a higher salary or better position at IBM. Mr. Adkins told me that he was disappointed, but understood, and wished me well.

26.     Mr. Adkins called me on or about October 15, 2008 to tell me that Randall MacDonald, the Senior Vice President of Human Resources, may call me. He said IBM wanted me to reconsider leaving. Mr. Adkins told me that they had asked human resources to put together a "save" package for me. I reiterated to Mr. Adkins that I was not looking for a counter-offer, and did not expect to accept one. Mr. Adkins asked me what my timeline was and I told him that I had advised Mr. Balog that I would be leaving at the end of two weeks.

27.     I had a call with Mr. MacDonald on October 20, 2008. Mr. MacDonald told me that he was disappointed to hear that I was leaving and that I was not interested in considering a counter-offer. Mr. MacDonald said that he had, nonetheless, prepared a counter-offer, which he presented to me. He also then told me that he had determined that my acceptance of an offer with Apple would violate the terms of the Noncompetition Agreement. He said that he determined that Apple was a competitor to IBM, noting that Apple and IBM were considered competitors in "salary surveys" that are apparently used in human resources. He further stated that if I did not want to accept the counter-offer, IBM would pay me my base salary to "sit out" for a year. Mr. MacDonald next asked me to consider my decision and the effect it would have

on my family. I was shocked by this comment, and I responded that I had already considered my decision very thoughtfully with my family. Given the effort he had taken to prepare a counter-offer, however, I agreed to give him a reply the next day. Mr. Adkins called me later that same evening to see if I was going to accept the counter-offer. I told him that I did not feel it would have been professional to give Mr. MacDonald an answer on the spot, but that it was still my intention to leave IBM. I told Mr. Adkins that I would discuss the issue with my wife later that evening. Mr. MacDonald asked me to respond to him personally the next day.

28.    The next day, October 21, 2008, I sent a memo to Mr. Balog and Mr. Adkins documenting that, as I had discussed with them over the prior week, I would be leaving IBM for an opportunity in consumer electronic products with Apple. I also informed them that I was confident that the position is not competitive with IBM and that I intended to adhere to all of my agreements with IBM. I also scheduled a call with Mr. MacDonald, in which I informed him that I would continue the course I had set in leaving IBM. Mr. MacDonald said he understood and that "the light would always be on at IBM." I also told him that I had offered Mr. Balog and Mr. Adkins to continue working to transition my role. Mr. MacDonald said that normally security would have a departing executive leave immediately, but that he understood from Mr. Adkins that I had the highest integrity and that he was confident that I would appropriately handle any intellectual property. Mr. MacDonald said I could continue to work through October 24, 2008 to manage the transition. I told Mr. MacDonald that I appreciated the opportunity to work through the transition and that I was the last person he would have to worry about mishandling intellectual property. I advised Mr. Adkins of my conversation with Mr. MacDonald and that I would stay through Friday to help with the transition.

29.    At no point during any discussion with IBM was I asked to terminate my position

immediately. Nor did anyone restrict my access to any documents or information, but rather I continued with my normal job functions for nearly two weeks after giving notice. Indeed, I was specifically authorized to contact IBM customers.

30. I completed the transition on Friday, October 24, 2008, and had an exit session with human resources that afternoon. When I left, I took only textbooks and memorabilia. I left at IBM both my primary computer with files intact, and my desk files. No one from IBM watched me clear out my office or escorted me out of the building. I have also searched my home to make sure that, after nearly twenty-six years at IBM, I did not inadvertently retain any IBM property of any kind. As a result of this search, I discovered a limited amount of IBM material that is of absolutely no value to Apple or to me in my new position. So there can be no question about this material, I boxed it up and sent it to the lawyers representing me in this lawsuit. I have kept only personnel documents that address me personally, such as benefits and stock information. I have honored and will fully honor my word to protect IBM's intellectual property.

31. Although IBM took no action to restrict my access to confidential information during the two weeks after I gave notice, they immediately blocked the sale of my vested RSUs and stock options. Based upon my preliminary review of documents, I estimate that as of October 21, 2008, I had approximately 1,331 vested RSUs (with a value of approximately $122,729.00). Additionally, I have determined based upon my preliminary review of documents that I have 25,758 stock options that were exercisable as of October 21, 2008. It is also my understanding that all of these options were exercisable prior to my signing the Noncompetition Agreement. On October 21, 2008, before my IBM departure date of October 24, 2008, I was advised that IBM had placed a block on both my RSUs and my stock options. I have been

unable to access the RSUs and stock options since that time. Subject to further review of the plans, I believe I am entitled to this compensation.

**<u>Hardship if Preliminary Injunction Granted</u>**

32.    If I am forced to "sit out" from the electronics industry for a year, I will suffer severe hardship. Opportunities such as the position with Apple seldom come along, and I do not believe I will be able to find a comparable position in a year (if ever), especially given the current downward trajectory of the economy. Moreover, IBM's expansive interpretation of the Noncompetition Agreement means that I will not be able to work for any technology company anywhere in the world, even if my position does not compete with IBM or draw upon confidential IBM information. Given that I am an electrical engineer by education and have spent the last two decades as a manager of engineers and professional technical executives, I have little chance of obtaining meaningful employment if IBM's broad interpretation of the restrictive covenant is accepted. Given the events that have transpired, I cannot imagine returning to a job at IBM.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: October 31, 2008
Austin, Texas

Mark D. Papermaster

**Exhibit 1**



# **Exhibit 2**



# **Exhibit 3**



# Exhibit 4



October 10, 2008

Mark Papermaster
10206 Sausalito Drive
Austin, TX 78759

Dear Mark:

Apple is delighted to offer you the position of Senior Vice President of Devices Hardware Engineering. In your new position you will report to Steve Jobs with the effective start date to be determined. We look forward to welcoming you to Apple.

## Compensation

Apple offers a highly competitive package of compensation and benefits. Your package includes the following:

Salary
You will receive an annual salary of

**REDACTED**

Restricted Stock Unit

FY'09 Annual Bonus Plan for Executive Officers
You will be eligible for participation in an annual bonus plan aligned with the FY'09 Performance Bonus Plan for Executive Officers. Details about the plan, including eligibility, financial measurements and bonus target, will be sent to you separately.

Benefits
As a full-time employee, you will be eligible to participate in Apple's comprehensive benefits program. We've enclosed a Corporate Benefits Program Summary in this folder with more details.

Upon hire, you may immediately enroll in the Apple 401(k) Plan to which both you and Apple contribute. Apple matches your contributions made through payroll withholding starting at 50 cents for each dollar you contribute up to 6% of eligible pay. As a convenience, you will be automatically enrolled in the Apple 401(k) Plan with a pre-tax contribution of 3% of your eligible base pay, with contributions starting approximately 30 days after your employment with Apple begins. If you do not wish to be automatically enrolled in the Apple 401(k) Plan, or if you wish to contribute a different percentage of eligible pay, you may opt-out or change your deferral election at any time.

Participation in any of Apple's benefits and stock option plans is subject to the written terms and conditions contained in the various plans. You'll be given additional information regarding these benefits plans during your New Employee Orientation sessions.

## Relocation

Your relocation package may include the following benefits, as appropriate. These benefits are subject to the budget limits in Apple's Domestic Relocation Guidelines:

Destination/Area Counseling
Travel to New Location
Household Goods Move and Storage (up to 30 days)
Relocation Allowance of one month's salary (less applicable taxes)
Home Finding Trip
120 days Interim Living (lodging, car rental, per diem)
Home Sale Marketing Assistance
Equity Advance
3% Quick Sale Bonus (US)$30,000 maximum, less taxes)
Selling Costs
New Home Closing Costs
Duplicate Mortgage Payments (2 months)
Tax Gross Up

## Conditions

This offer of employment is contingent on the following conditions.

- On your first day of employment, and possibly from time to time thereafter, you must show proof of identity and legal right to work in the United States as required by and in accordance with the process and procedures of the United States Immigration Reform and Control Act (IRCA).

- Due to U.S. Department of Commerce requirements, if you're not a U.S. citizen, U.S. permanent resident, Canadian citizen, political refugee, or a political asylum holder, you will be required to sign an assurance regarding obligations not to export controlled technical data or software to certain countries. If you're a citizen of a restricted country (as identified by the Department of Commerce), Apple could be required to obtain an export license from the Department of Commerce. Apple will work with you to obtain this license within a time limit established by Apple. If for any reason Apple doesn't receive a license within the established time frame, Apple may terminate your employment.

- You must sign the Intellectual Property Agreement and return the signed agreement with this offer letter. Any exceptions or approvals required under the terms of the Agreement must be approved by your division's vice president and Apple's Legal Department prior to your beginning work.

- We believe that every employee should use good judgment and exercise uncompromising integrity when conducting Apple business. By accepting this offer, you acknowledge that you have received and read Apple's Business Conduct policy and that you agree to comply with Apple's Business Conduct policy.

- You must receive a satisfactory background check in accordance with Apple policy.

If any of the above conditions are not satisfied, Apple may withdraw this offer of employment.

Our employment relationship with Apple will be terminable at will. This means that either you or Apple may terminate the employment relationship at any time and for any reason or for no reason.

Your employment will be governed by and interpreted under the laws of the State of California, without regard to conflict of law principles.

In making your decision to accept this offer of employment, you agree and acknowledge that you have not relied upon any other promises or representations made by Apple or our representatives, except those made in this letter.

This offer of employment is valid until Friday, October 17, 2008. We must receive your written acceptance of this offer no later than 5:00 p.m. Pacific Time that day.

Mark, please accept this offer by signing below. Return this letter to us in the enclosed FedEx envelope along with the paperwork noted in the Forms to Complete section of this folder and confirm your start date with me. Be sure to retain copies for your personal records. If you have any questions regarding this offer or any of its enclosures, please contact me at 408-974-0894.

Sincerely,

Danielle Lambert
VP of Human Resources
On behalf of Apple, Inc.

I accept the offer (sign below):

_Mark Papermaster_
Candidate Signature

_11 / 1 / 2008_
Expected Start Date

_10 / 15 / 2008_
Date Signed

Apple Inc. | 1 Infinite Loop | Cupertino, California 95014

<u>**Exhibit 5**</u>



# Intellectual Property Agreement

This Agreement sets forth the agreements between you and Apple Inc. (Apple) concerning any inventions you may make in connection with your employment by Apple and your treatment of Apple's confidential and proprietary information. Apple has agreed to employ you (or if this Agreement is being executed after you have already been employed by Apple, to continue to employ you) on the condition that you agree to and will abide by the following terms and conditions for the duration of your employment by Apple (including, but not limited to, any leave of absence, or other time off) and thereafter.

1.0 INVENTIONS. As used in this Agreement, the term "Inventions" means any and all inventions, ideas, and discoveries, including improvements, original works of authorship, designs, formulas, processes, computer programs or portions thereof, databases, trade secrets and proprietary information, documentation, and materials made, created, conceived or reduced to practice by you, whether alone or jointly with others.

a. Your Rights in Inventions

(i) Prior Inventions. In the space provided below, or on a separate sheet attached to this Agreement, you may list all Inventions (a) that you made prior to your employment by Apple; (b) that you claim belong to you, or that you claim an ownership interest in, or that you claim any other legal right or title; and (c) in which you wish to retain any claimed ownership or other legal rights ("Prior Inventions"). If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, world-wide license to any Prior Invention that is now or hereafter infringed by an Apple product, process, or method of doing business (hereinafter "Apple Product") if: (i) you were involved in the development or implementation of that portion of the Apple Product which infringes your Prior Invention, or (ii) you acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their development or implementation of the Apple Product, or (iii) upon first learning of Apple's use of your Prior Invention you do not immediately notify in writing your Apple Vice President of Apple's infringing use of your Prior Invention and the need for a license thereto. If you do not list a Prior Invention, you acknowledge and agree that no such Prior Inventions exist and, to the extent such Prior Inventions do exist, you waive any and all rights or claims of ownership to such Prior Inventions. You understand that your listing of any Prior Invention(s) here does not constitute an acknowledgment by Apple of the existence or extent of such Prior Invention, nor of your ownership of such Prior Inventions. Please do not use this space to disclose an on-going business or project, or a product that you are developing and/or distributing; such on-going activity must be presented to your manager in writing, and approved in advance by your Apple Vice President.

Prior Inventions (description and identifying number of patent, if applicable):

_PIPELINED CLOCK DISTRIBUTION_     _1998-06-09_
Title                                       Date

_PATENT 5764083_
Brief Description of Invention

_DESIGN FOR SELF-RESETTING CMOS CIRCUITS_

☐ A separate sheet listing Employee Inventions is attached.

(ii) Future Employee Inventions.[1] Apple acknowledges and agrees, in accordance with applicable state law, that any inventions (a) that you develop entirely on your own time; and (b) that you develop without using Apple's or its subsidiaries' equipment, supplies, facilities, or trade secret information; and (c) that do not result from any work performed by you for Apple or its subsidiaries; and (d)[2] that do not relate, at the time of conception or reduction to practice, to Apple's or its subsidiaries' business or products, or to Apple's or its subsidiaries' actual or demonstrably anticipated research or development, will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple.

b. Apple's Rights in Inventions

(i) Assignment of Inventions to Apple. You agree that all inventions that (a) are developed using the equipment, supplies, facilities, or Proprietary Information of Apple or its subsidiaries; or (b) result from or are suggested by work performed by you for Apple or its subsidiaries; or (c)[3] are conceived or reduced to practice during your employment by Apple and relate to the business and products, or to the actual or demonstrably anticipated research or development of Apple or its subsidiaries ("Apple Inventions"), will be the sole and exclusive property of Apple, and you will and hereby do assign all your right, title and interest in such Apple Inventions to Apple. You agree to perform any and all acts requested by Apple, if any, to perfect this assignment.

(ii) Disclosure. You agree to make full written disclosure promptly to Apple of any and all Apple Inventions.

(iii) Assignment of Moral Rights to Apple. In addition, to the extent permitted by law, you hereby transfer and assign any "moral" rights that you may have in any Apple invention(s) under any copyright or other law, whether U.S. or foreign. You agree to waive and never to assert any such "moral" rights in Apple inventions during or after the termination of your employment by Apple. You agree that Apple, its subsidiaries, and its licensees are not required to designate you as the author of any Apple inventions when distributed. You also agree that Apple retains sole discretion with regard to how and for what purposes, if any, such Apple invention(s) are used.

c. Protection of Apple Inventions

You agree (at Apple's expense) to assist Apple in every proper way to obtain and to help Apple enforce patents, copyrights, and other legal protections for Apple inventions in any and all countries. You agree to promptly execute any documents that Apple may reasonably request for use in obtaining or enforcing such patents, copyrights, and other legal protections. You acknowledge that all original works of authorship that are made by you (solely or jointly with others) within the scope of your employment by Apple, and that are protectable by copyright, are works made for hire, as that term is defined in the United States Copyright Act (17 U.S.C. §101).

2.0 CONFIDENTIAL PROPRIETARY INFORMATION. You understand that your employment by Apple creates a relationship of confidence and trust with respect to any information of a confidential, proprietary and secret nature that may be disclosed to you or otherwise learned by you in the course of your employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. Such confidential, proprietary, and secret information includes, but is not limited to, information and material relating to past, present or future inventions, marketing plans, manufacturing and product plans, technical specifications, hardware designs and prototypes, business strategies, financial information, and forecasts, personnel information, and customer lists,
and is referred to collectively in this Agreement as "Proprietary Information".

a. Confidentiality of Proprietary Information. You understand and agree that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials or copies thereof, whether on paper, magnetic or optical media or any other medium, containing any Proprietary Information.

b. Information of Others. You agree that during the tenure of your employment by Apple and thereafter, you will not improperly use or disclose to Apple any confidential, or proprietary, or secret information of your former employers or any other person. You further agree that you have not, and during your employment with Apple will not, bring any confidential, proprietary or secret information of your former employer(s) or any other person(s) onto Apple property.

## 3.0 NO CONFLICTING OBLIGATIONS

a. No Conflicting Outside Interests. You agree that during the tenure of your employment by Apple you will not plan or engage in any other employment, occupations, consulting or other business activities or commitments competitive with or directly related to Apple's business or products, or to its actual or demonstrably anticipated research or development, nor will you engage in any other activities that conflict with your employment obligations to Apple. Activities and commitments as used herein do not include passive investments in stocks or other
financial instruments.

b. No Conflicting Agreements. You represent to Apple that you have no other commitments that would hinder or prevent the full performance of your duties as an Apple employee or your obligations under this Agreement, and you agree not to enter into any such conflicting agreement during the tenure of your employment by Apple.

c. Disclosure of Agreement. You hereby authorize Apple to notify others, including customers of Apple, and any future employers you may have, of the terms of this Agreement and your responsibilities under this Agreement.

d. During your employment and for a period of one (1) year following your termination date, you will not, directly or indirectly, solicit, encourage, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple.

## 4.0 NO IMPLIED EMPLOYMENT RIGHTS. You understand and agree that no term or provision of this Agreement confers upon you any rights to continued employment by Apple and that no term or provision of this Agreement obligates Apple to employ you for any specific period of time or interferes with or restricts your right or Apple's right to terminate your employment at any time for any reason.

## 5.0 EQUITABLE RELIEF. A breach of the provisions of sections 1 or 2 of this Agreement would cause irreparable harm and significant injury to Apple, the quantification of which is difficult to ascertain. Because such harm and injury could not be compensable by damages alone, you agree that Apple will have the right to enforce sections 1 and 2 of this Agreement by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies available to Apple in the event of a breach of this Agreement.

## 6.0 GENERAL PROVISIONS

a. Severability. If one or more of the provisions of this Agreement are deemed void or unenforceable by law, then the remaining provisions will continue in full force and effect.

b. Governing Law. This agreement will be governed by the laws of the state where you are currently or were most recently employed, excluding that body of law concerning conflicts of law. Any arbitration or judicial action between the parties relating to this Agreement will take place in Santa Clara County, California, and you and Apple each consent to the personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California.

c. Successors and Assigns. This Agreement will be binding upon your heirs, executors, administrators and other legal representatives, and will be for the benefit of Apple, its successors and assigns.

d. Entire Agreement. This Agreement sets forth the entire agreement between you and Apple relating to the subject matter of this Agreement. No modification to or amendment of this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both you and an Apple vice president. Any subsequent changes in your duties, salary or compensation will not affect the validity or scope of this Agreement.

e. Compliance with Laws. You agree that you will comply, and do all things necessary for Apple and its subsidiaries to comply, with the laws and regulations of all governments where Apple and its subsidiaries do business, and with provisions of contracts between any such government or its contractors and Apple or its subsidiaries.

7.0 VOLUNTARY AGREEMENT. You acknowledge that you have read this Agreement carefully, that you understand all of its terms, that all agreements between you and Apple relating to the subjects covered in this Agreement are contained in it, and that you have entered into this Agreement voluntarily and not in reliance upon any promises or representations other than those contained in this Agreement itself.

You further acknowledge that you have had the opportunity to discuss this Agreement with your private legal counsel.

Signature: *Mark Papermaster*   Date: 10 /15/ 08

Printed name: MARK   PAPERMASTER

Please make and retain a copy of this agreement for your records.

[1] For Employees in California: Labor Code § 2870 provides: "(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either: (i) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

[2] For employees in the states of Kansas, Minnesota, or Washington: Section 1.0, A.(ii)(d) reads as follows: "(d) that do not directly relate at the time of conception or reduction to practice to Apple's business or products, or actual or demonstrably anticipated research or development of Apple will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple."

[3] For employees in the states of Kansas, Minnesota, or Washington: Section 1.0, B.(ii)(c) reads as follows: "(c) which are conceived or reduced to practice during your employment by Apple and which relate directly to the business or products, or actual or demonstrably anticipated research or development of Apple ("Apple Inventions"), will be the sole and exclusive property of Apple, and you will and hereby do assign all your right, title and interest in such Apple Inventions to Apple."