UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, <br><br>                       Plaintiff, <br> VS. <br><br> MARK D. PAPERMASTER, <br><br>                      Defendant. | 08 Civ. 9078 (KMK) <br><br> **DECLARATION OF DANIELLE LAMBERT** |

I, Danielle Lambert, declare as follows:

1.      I am currently employed by Apple Inc. ("Apple") as Vice President of Human Resources. I am responsible for supervising Apple's hiring of senior executives, such as Mark Papermaster. I was personally involved in the process of recruiting and ultimately hiring Mark to come work at Apple.

2.      Apple and its wholly-owned subsidiaries design, manufacture, and market personal computers, portable digital music players, and mobile communication devices and sell a variety of related software, services, peripherals, and networking solutions. In addition, Apple sells a variety of third-party Mac, iPod and iPhone compatible products including application software, printers, storage devices, speakers, headphones, and various other accessories and peripherals through its online and retail stores. Apple's corporate headquarters are located in Cupertino, California.

3.      Mark D. Papermaster has been hired by Apple to serve as Apple's Senior Vice President, Devices Hardware Engineering, leading Apple's iPod and iPhone hardware engineering teams.

Dockets.Justia.com

4.    Both the iPhone and the iPod are considered "consumer electronics," as they are designed, manufactured, and marketed for everyday use by individuals. Other examples of "consumer electronics" include televisions, cameras, PDAs, calculators, VCRs, DVD players, audio devices, camcorders, and many other products. They differ from professional electronics, such as servers, which are mainly used by corporations and companies to store and transmit numerous pieces of electronic data in their daily business use.

5.    In approximately October, 2007, Apple began a search for an executive in the consumer electronics field to serve under the current Senior Vice President, iPod Division, and who could eventually be the successor in that role. For the next five months, we interviewed numerous individuals with backgrounds in consumer electronics. We were not successful in finding a suitable replacement. Although several of the people we interviewed possessed the technical skills necessary to understand the complex design of the iPod and iPhone, they lacked the managerial and leadership skills necessary to lead such a large and extensive undertaking. Moreover, in many cases we did not believe that the candidates would fit into Apple's culture.

6.    Accordingly, we shifted our focus from searching for someone with specific experience in consumer electronics to searching for someone who had a strong background in technology and engineering in general, who also had strong managerial skills and would fit within Apple's culture. Apple has previously had success with this approach. Robert Mansfield, who is currently Senior Vice President of Macintosh Hardware Engineering, joined Apple in 1999 and currently runs engineering of our Mac product line which includes the development of laptops. Although Bob had no experience developing consumer electronics before working at Apple, his overall technical and engineering knowledge in general, along with his strong managerial skills, made him successful in developing our laptop programs.

7.     Given this revised approach, we asked Bob Mansfield whether he could recommend any suitable candidates who, like himself, had a strong technical and engineering background, good managerial skills, and would be able to perform well in Apple's corporate environment. Bob provided a list of several individuals, one of whom was Mark Papermaster. Bob had worked previously with Mark when they were both at IBM. He told us that Mark is a very smart person who understands systems and semiconductors, but had little understanding of consumer electronics. A true and correct copy of an email chain dated January 31, 2008 between D. Lambert and R. Mansfield is attached hereto as Exhibit 1. We also asked Tim Cook, our Chief Operating Officer who also knew Mark, whether he believed Mark would be a good fit for the position. Tim confirmed that Mark was a good leader, but agreed with Bob that Mark lacked the sort of specific computer experience relevant to the iPod project. However, Tim remarked that he thought Mark would fit well in Apple's culture. A true and correct copy of an email chain dated January 29, 2008 between D. Lambert and T. Cook is attached hereto as Exhibit 2.

8.     In early February 2008, we began interviewing the individuals that Bob Mansfield recommended. Just as before, many of them did not possess the right combination of technical skills, managerial skills and personality "fit" necessary to succeed at Apple. Specifically, the role requires someone who is able to succeed in a fast-paced, highly creative, constantly changing business environment, and who is able to attract the best young engineers to work on the product. The people we initially interviewed all had strong technological backgrounds but we believed they lacked the package of leadership qualities necessary to manage the team.

9.     When we interviewed Mark, a few individuals initially questioned his lack of experience in consumer electronics. In particular, the senior executive for the iPod/iPhone development team noted that Mark's experience with servers was very different from the system

3

architecture that he would handle in consumer electronics and with the iPod in particular. However, nobody questioned Mark's ability to lead a development team.

10.     Following further discussions, and with executive changes not imminent in light of upcoming iPhone releases to which the group was committed, senior management initially concluded that Mark might be better suited to developing the hardware for products in the area of personal computers. This was due, in part, to Mark's lack of experience in consumer electronics. Apple approached Mark about a possible position in that area, but Mark stated that the position was not the right fit for him and declined to pursue it.

11.     Following the release of the new iPhone in June 2008, the release of the new iPods in September 2008, and further developments with respect to management changes in that development team, in September 2008, I reinstituted and intensified our efforts to find a replacement for the senior executive for the iPod/iPhone development team. Mark's name immediately came to mind. Many at Apple remembered Mark as having the sort of dynamic personality and leadership qualities necessary to lead Apple's iPod and iPhone device engineering. Mark also possessed the broad understanding of technology, similar to Bob Mansfield, that would allow him to effectively perform his job. We therefore contacted Mark to set up an interview.

12.     Mark interviewed at Apple on October 7, 2008. At the conclusion of the day, we told Mark his reviews were extremely positive. Mark, in turn, informed us that he had been recently offered a new position at IBM and that we would have to complete our interviews promptly if we intended to pursue him, as he had no intention of accepting the new position at IBM only to leave shortly thereafter. Accordingly, we extended Mark's visit for a second day and scheduled additional interviews for him on October 8, 2008. During the interviews, Mark

met with Apple senior executives. Once again, our impressions of Mark were highly favorable. Although Mark did not have any specific experience in consumer electronics, we believed that like Bob Mansfield, his strong engineering acumen and managerial skills would allow him to make the transition, and we believed that he would thrive in Apple's culture.

13.     On October 10, 2008, we offered Mark the position and he accepted immediately. On October 14, 2008, Mark notified me that he had resigned his position at IBM. He told me that his superior at IBM, Rodney Adkins, was disappointed with Mark's decision but that "he understood."

14.     Throughout the process we had no concerns about the possibility of trade secrets or confidentiality issues relating to IBM, for the simple reason that IBM and Apple are not competitors. IBM has not been involved in the consumer electronics business for several years.

15.     Nonetheless, as a condition of his employment Mark was asked to sign (and did sign) an Intellectual Property Agreement ("IPA") on October 15, 2008. A true and correct copy is attached hereto as Exhibit 3. The IPA prohibits Mark from disclosing to Apple any confidential information he gained while working at IBM. Specifically, the IPA provides in relevant part:

> Information of Others. You agree that during the tenure of your employment by Apple and thereafter, you will not improperly use or disclose to Apple any confidential or proprietary, or secret information of your former employers or any other person. You further agree that you have not, and during your employment with Apple will not, bring any confidential, proprietary or secret information of your former employer(s) or any other person(s) onto Apple property.

(Exhibit 3, § 2.0(b)).

5

16.     Apple has hired Mark Papermaster because he has strong general engineering

skills, is an outstanding leader, and because we believe he will be a good cultural match at

Apple.  Mark was not hired so that Apple could gain confidential and proprietary information

from IBM.  Indeed, Mark was hired in spite of the fact that the areas for which he will have

responsibility at Apple were not areas in which he had prior relevant experience.

17.     Apple is not a "significant competitor" or a "major competitor" of IBM.  In any

event, Mark will be managing the development of certain hand-held consumer electronic

devices, namely the iPod and iPhone.  Mark's position at Apple will not require him to draw

upon any confidential information that he may have learned at IBM concerning the development

of high performance servers or microprocessors.  In fact, Mark is prohibited under the IPA from

disclosing any confidential information he may have gained at IBM.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  October 31, 2008
Cupertino, California

_____
Danielle Lambert

# Exhibit 1

REDACTED

From: Robert Mansfield <bobmans@apple.com>
Date: January 31, 2008 12:35:33 PM PST
To: Danielle Lambert <lambert@apple.com>
Subject: Re: Dani's List

On Jan 31, 2008, at 12:23 PM, Danielle Lambert wrote:

Hi Bob,

REDACTED Just a quick update on a couple of these guys- We were able to connect with              and he is cautiously open to at exploring conversations with us. Same goes for Mark Papermaster, so we're working on getting him out here. You mentioned Mark being spot on in systems and semiconductor understanding but may be off in other ways... Is that cultural, leadership? Anything to be concerned of?

Mark comes from the exact same background that I do...I worked with Mark forever at IBM. Mark stayed at IBM...you will find him to be immensely smart about microprocessor design, large systems, and semiconductors. He has not had the benefit of education outside of IBM. I would be worried about the differences in pace of development, etc but not overly worried.

REDACTED

had also recommended a guy named                   :
                                    I'll be meeting      , but
wondered if you knew of him at all and if so had a read on him?

Yep, we are looking at          for          deal also.          REDACTED

I know :     ;, worked with him at                knows him from there
also).          is very strong technically...would really fit in that way. My
working with him goes back 12 years...back then he had a pretty big ego, but
          says he has matured/mellowed a bit since our      days. So I think he is
worth our talking to...

I guess my biggest issue is that these are people who fit the description you
gave me...but frankly I have a hard time matching that description with what
you told me the person would do.

I know the bigger plan is certainly none of my business, and I am not prying,
but I want you to understand that I am just trying to give you names of people
that fit what you asked. None of these folks have the expertise Tony has, for
instance...but you didn't ask for that.

Sorry, just a bit confused, and I don't read between the lines well.

Bob


Thanks,

Dani


On Jan 4, 2008, at 4:11 PM, Robert Mansfield wrote:


Dani,


You asked me for a list of folks today.


I will ponder on this awhile and see if I can come up
with more...


If you need phone numbers, I can supply most of
them.


Bob

Here you go:

1.                    is a silicon/systems guy who
recently left ι              ι. There he was their CTO.
is very technical, loves the technology and chips, and          REDACTED
as CTO of 1               has been involved in a lot of
technology...I can tell you a lot more about    ' if you
need.

REDACTED

2.     _                    is a very good VP of chip
design at              He is very chip centric, got a very
solid chip design/semiconductor background.  You
would have to move fast on him, as he is leaving
           for another opportunity.

3.               - VP of Engineering at
has a very strong systems background.  He is pretty          REDACTED
up on wireless, having been immersed in it for a
number of years now.

4.               ι - I think      is at           When I
REDACTED          worked with him at     I, he was a very strong
systems architect, and very tuned into designing
systems and silicon.

5.                    is the      guy.  He would be
good, but we need him where he is.  I know several
REDACTED          others of this class at      ...but we may consider
them off limits.  if we don't, let me know and I will
help compile that list.

6. Mark Papermaster - VP at IBM.  Mark runs their
microprocessor design group.  Mark fits the bill wrt
systems and semiconductor understanding, but in
every other way is a long shot.

7.        _              recently moved to    ι and          REDACTED
is running their GPU design group.  I worked with
'     in the past.          is very technical and
engineering oriented.

8.                         has been in the VC community
for a long time. I worked with        at        . I put
on this list because he is another great contact point
for this type of great person.

**REDACTED**

**REDACTED**

# Exhibit 2

**REDACTED**

From: Tim Cook <tcook@apple.com>
Date: January 29, 2008 3:52:02 PM PST
To: Danielle Lambert <lambert@apple.com>
Subject: Re: Mark Papermaster?

I do remember him. He struck me as similar to Bob Mansfield. High Integrity, good leader, deep technical skills in the semiconductor business.   I believe the two of them worked together at IBM---Bob should be able to provide very good insight from both IBM days and then later working with him on Power PC.   His largest challenge in leading iPod would be that he would not have consumer experience, ie fast product cycles and I believe he has spent his entire career at IBM which is much more process driven.  Still, I do think he could fit culturally.  I would view him more as an Eng leader than a GM.


Tim
On Jan 29, 2008, at 3:30 PM, Danielle Lambert wrote:

Hi Tim,

Hope you had a good trip.

Quick question for you- Do you by chance remember
Mark Papermaster who ran the microprocessor design
group at IBM?

If so, do you think he might be worth looking at for
the iPod job? He is said to be sharp on the
systems/semiconductor side but I don't know much
else about him and whether he would be a cultural
match.

Any recollection of him?

Dani

**REDACTED**

# Exhibit 3



# Intellectual Property Agreement

This Agreement sets forth the agreements between you and Apple Inc. (Apple) concerning any inventions you may make in connection with your employment by Apple and your treatment of Apple's confidential and proprietary information. Apple has agreed to employ you (or if this Agreement is being executed after you have already been employed by Apple, to continue to employ you) on the condition that you agree to and will abide by the following terms and conditions for the duration of your employment by Apple (including, but not limited to, any leave of absence, or other time off) and thereafter.

1.0 INVENTIONS. As used in this Agreement, the term "Inventions" means any and all inventions, ideas, and discoveries, including improvements, original works of authorship, designs, formulas, processes, computer programs or portions thereof, databases, trade secrets and proprietary information, documentation, and materials made, created, conceived or reduced to practice by you, whether alone or jointly with others.

a. Your Rights in Inventions

(i) Prior Inventions. In the space provided below, or on a separate sheet attached to this Agreement, you may list all Inventions (a) that you made prior to your employment by Apple; (b) that you claim belong to you, or that you claim an ownership interest in, or that you claim any other legal right or title; and (c) in which you wish to retain any claimed ownership or other legal rights ("Prior Inventions"). If you do list such Prior Inventions, you hereby grant to Apple a royalty-free, irrevocable, perpetual, world-wide license to any Prior Invention that is now or hereafter infringed by an Apple product, process, or method of doing business (hereinafter "Apple Product") if: (i) you were involved in the development or implementation of that portion of the Apple Product which infringes your Prior Invention, or (ii) you acquiesced or permitted other Apple employees to utilize your Prior Invention in the course of their development or implementation of the Apple Product, or (iii) upon first learning of Apple's use of your Prior Invention you do not immediately notify in writing your Apple Vice President of Apple's infringing use of your Prior Invention and the need for a license thereto. If you do not list a Prior Invention, you acknowledge and agree that no such Prior Inventions exist and, to the extent such Prior Inventions do exist, you waive any and all rights or claims of ownership to such Prior Inventions. You understand that your listing of any Prior Invention(s) here does not constitute an acknowledgment by Apple of the existence or extent of such Prior Invention, nor of your ownership of such Prior Inventions. Please do not use this space to disclose an on-going business or project, or a product that you are developing and/or distributing; such on-going activity must be presented to your manager in writing, and approved in advance by your Apple Vice President.

Prior Inventions (description and identifying number of patent, if applicable):

*PIPELINED CLOCK DISTRIBUTION*     *1998-06-09*
Title                                   Date

*PATENT 5764083*
Brief Description of Invention

*DESIGN FOR SELF-RESETTING CMOS CIRCUITS*

☐ A separate sheet listing Employee Inventions is attached.

(ii) Future Employee inventions.[1] Apple acknowledges and agrees, in accordance with applicable state law, that any Inventions (a) that you develop entirely on your own time; and (b) that you develop without using Apple's or its subsidiaries' equipment, supplies, facilities, or trade secret information; and (c) that do not result from any work performed by you for Apple or its subsidiaries; and (d)[2] that do not relate, at the time of conception or reduction to practice, to Apple's or its subsidiaries' business or products, or to Apple's or its subsidiaries' actual or demonstrably anticipated research or development, will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple.

b. Apple's Rights In Inventions

(i) Assignment of Inventions to Apple. You agree that all Inventions that (a) are developed using the equipment, supplies, facilities, or Proprietary Information of Apple or its subsidiaries; or (b) result from or are suggested by work performed by you for Apple or its subsidiaries; or (c)[3] are conceived or reduced to practice during your employment by Apple and relate to the business and products, or to the actual or demonstrably anticipated research or development of Apple or its subsidiaries ("Apple Inventions"), will be the sole and exclusive property of Apple, and you will and hereby do assign all your right, title and interest in such Apple Inventions to Apple. You agree to perform any and all acts requested by Apple, if any, to perfect this assignment.

(ii) Disclosure. You agree to make full written disclosure promptly to Apple of any and all Apple Inventions.

(iii) Assignment of Moral Rights to Apple. In addition, to the extent permitted by law, you hereby transfer and assign any "moral" rights that you may have in any Apple Invention(s) under any copyright or other law, whether U.S. or foreign. You agree to waive and never to assert any such "moral" rights in Apple Inventions during or after the termination of your employment by Apple. You agree that Apple, its subsidiaries, and its licensees are not required to designate you as the author of any Apple Inventions when distributed. You also agree that Apple retains sole discretion with regard to how and for what purposes, if any, such Apple Invention(s) are used.

c. Protection of Apple Inventions

You agree (at Apple's expense) to assist Apple in every proper way to obtain and to help Apple enforce patents, copyrights, and other legal protections for Apple Inventions in any and all countries. You agree to promptly execute any documents that Apple may reasonably request for use in obtaining or enforcing such patents, copyrights, and other legal protections. You acknowledge that all original works of authorship that are made by you (solely or jointly with others) within the scope of your employment by Apple, and that are protectable by copyright, are works made for hire, as that term is defined in the United States Copyright Act (17 U.S.C. §101).


2.0 CONFIDENTIAL PROPRIETARY INFORMATION. You understand that your employment by Apple creates a relationship of confidence and trust with respect to any information of a confidential, proprietary and secret nature that may be disclosed to you or otherwise learned by you in the course of your employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. Such confidential, proprietary, and secret information includes, but is not limited to, information and material relating to past, present or future Inventions, marketing plans, manufacturing and product plans, technical specifications, hardware designs and prototypes, business strategies, financial information, and forecasts, personnel information, and customer lists,
and is referred to collectively in this Agreement as "Proprietary Information".

a. Confidentiality of Proprietary Information. You understand and agree that your employment by Apple requires you to keep all Proprietary Information in confidence and trust for the tenure of your employment and thereafter, and that you will not use or disclose Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. Upon termination of your employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials or copies thereof, whether on paper, magnetic or optical media or any other medium, containing any Proprietary Information.

b. Information of Others. You agree that during the tenure of your employment by Apple and thereafter, you will not improperly use or disclose to Apple any confidential, or proprietary, or secret information of your former employers or any other person. You further agree that you have not, and during your employment with Apple will not, bring any confidential, proprietary or secret information of your former employer(s) or any other person(s) onto Apple property.

## 3.0 NO CONFLICTING OBLIGATIONS

a. No Conflicting Outside Interests. You agree that during the tenure of your employment by Apple you will not plan or engage in any other employment, occupations, consulting or other business activities or commitments competitive with or directly related to Apple's business or products, or to its actual or demonstrably anticipated research or development, nor will you engage in any other activities that conflict with your employment obligations to Apple. Activities and commitments as used herein do not include passive investments in stocks or other
financial instruments.

b. No Conflicting Agreements. You represent to Apple that you have no other commitments that would hinder or prevent the full performance of your duties as an Apple employee or your obligations under this Agreement, and you agree not to enter into any such conflicting agreement during the tenure of your employment by Apple.

c. Disclosure of Agreement. You hereby authorize Apple to notify others, including customers of Apple, and any future employers you may have, of the terms of this Agreement and your responsibilities under this Agreement.

d. During your employment and for a period of one (1) year following your termination date, you will not, directly or indirectly, solicit, encourage, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple.

## 4.0 NO IMPLIED EMPLOYMENT RIGHTS.
You understand and agree that no term or provision of this Agreement confers upon you any rights to continued employment by Apple and that no term or provision of this Agreement obligates Apple to employ you for any specific period of time or interferes with or restricts your right or Apple's right to terminate your employment at any time for any reason.

## 5.0 EQUITABLE RELIEF.
A breach of the provisions of sections 1 or 2 of this Agreement would cause irreparable harm and significant injury to Apple, the quantification of which is difficult to ascertain. Because such harm and injury could not be compensable by damages alone, you agree that Apple will have the right to enforce sections 1 and 2 of this Agreement by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies available to Apple in the event of a breach of this Agreement.

## 6.0 GENERAL PROVISIONS

a. Severability. If one or more of the provisions of this Agreement are deemed void or unenforceable by law, then the remaining provisions will continue in full force and effect.

b. Governing Law. This agreement will be governed by the laws of the state where you are currently or were most recently employed, excluding that body of law concerning conflicts of law. Any arbitration or judicial action between the parties relating to this Agreement will take place in Santa Clara County, California, and you and Apple each consent to the personal jurisdiction of and venue in the state and federal courts within Santa Clara County, California.

c. Successors and Assigns. This Agreement will be binding upon your heirs, executors, administrators and other legal representatives, and will be for the benefit of Apple, its successors and assigns.

d. Entire Agreement. This Agreement sets forth the entire agreement between you and Apple relating to the subject matter of this Agreement. No modification to or amendment of this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both you and an Apple vice president. Any subsequent changes in your duties, salary or compensation will not affect the validity or scope of this Agreement.

e. Compliance with Laws. You agree that you will comply, and do all things necessary for Apple and its subsidiaries to comply, with the laws and regulations of all governments where Apple and its subsidiaries do business, and with provisions of contracts between any such government or its contractors and Apple or its subsidiaries.

**7.0 VOLUNTARY AGREEMENT.** You acknowledge that you have read this Agreement carefully, that you understand all of its terms, that all agreements between you and Apple relating to the subjects covered in this Agreement are contained in it, and that you have entered into this Agreement voluntarily and not in reliance upon any promises or representations other than those contained in this Agreement itself.

You further acknowledge that you have had the opportunity to discuss this Agreement with your private legal counsel.

_____ *Mark Papermaster* _____ Date **10/15/08**
Signature

_____ MARK PAPERMASTER _____
Printed name

Please make and retain a copy of this agreement for your records.

---

[1] For Employees in California: Labor Code §2870 provides:"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either: (i) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or (2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

[2] For employees in the states of Kansas, Minnesota, or Washington: Section 1.0, A.(ii)(d) reads as follows:"(d) that do not directly relate at the time of conception or reduction to practice to Apple's business or products, or actual or demonstrably anticipated research or development of Apple will be owned entirely by you, even if developed by you during the time period in which you are employed by Apple."

[3] For employees in the states of Kansas, Minnesota, or Washington: Section 1.0. B.(ii)(c) reads as follows:"(c) which are conceived or reduced to practice during your employment by Apple and which relate directly to the business or products, or actual or demonstrably anticipated research or development of Apple ("Apple Inventions"), will be the sole and exclusive property of Apple, and you will and hereby do assign all your right, title and interest in such Apple Inventions to Apple."