**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                              Plaintiff,

            vs.

MARK D. PAPERMASTER,

                              Defendant.

No. 08-cv-9078 (KMK)


**[CONFIDENTIAL TREATMENT**
**REQUESTED]**


**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

Evan R. Chesler
Stephen S. Madsen
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business*
*Machines Corporation*

Dockets.Justia.com

# **Table of Contents**

Page

Table of Authorities ..................................................................................................................... ii

Table of Abbreviations ................................................................................................................ iii

Introduction ................................................................................................................................... 1

Argument ........................................................................................................................................ 2

I.      IBM and Apple Are Competitors.............................................................................. 2

II.     IBM Will Suffer Irreparable Harm if Preliminary Relief Is Not Entered. ............................ 4

III.    IBM Is Likely to Prevail on the Merits. ................................................................... 8

IV.    Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the
Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor. ............................ 10

Conclusion ................................................................................................................................... 10

# Table of Authorities

Page(s)

**Cases**

*BDO Seidman v. Hirschberg,*
    93 N.Y.2d 382 (1999) ................................................................................................................ 9

*Earthweb, Inc. v. Schlack,*
    71 F. Supp. 2d 299 (S.D.N.Y. 1999) ...................................................................................... 4, 5

*Estee Lauder Cos. v. Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ........................................................................................ 5

*Int'l Creative Mgmt., Inc. v. Abate,*
    No. 07 Civ. 1979 (PKL), U.S. Dist. Lexis 22964 (S.D.N.Y. Mar. 28, 2007) ..................................... 4

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) ........................................................................................................ 7


**Other Authorities**

17A C.J.S. Contracts § 266 ................................................................................................................ 9

**Table of Abbreviations**

| Title of Document | Abbreviation |
|---|---|
| IBM's Opening Memorandum in Support of Its Motion for Preliminary Injunction dated October 24, 2008 | IBM Br. |
| Declaration of Rodney C. Adkins dated October 23, 2008 | Adkins Decl. |
| Declaration of J. Randall MacDonald dated October 23, 2008 | MacDonald Decl. |
| Mark D. Papermaster's Memorandum in Opposition to the Motion for Preliminary Injunction dated October 31, 2008 | Opp'n |
| Declaration of Mark D. Papermaster dated October 31, 2008 | Papermaster Decl. |
| Declaration of Danielle Lambert dated October 31, 2008 | Lambert Decl. |
| Declaration of Robert Mansfield dated October 31, 2008 | Mansfield Decl. |
| Declaration of Blair G. Connelly dated October 31, 2008 | Connelly Decl. |
| Supplemental Declaration of Rodney C. Adkins dated November 4, 2008 | Supp. Adkins Decl. |
| Supplemental Declaration of Stephen S. Madsen dated November 4, 2008 | Supp. Madsen Decl. |

International Business Machines Corporation ("IBM" or "the Company") respectfully

submits this reply memorandum of law in support of its motion for preliminary injunction.

## Introduction

Mr. Papermaster concedes that he signed a binding, one-year noncompetition covenant

in exchange for being selected as a member of IBM's elite Integration & Values Team ("I&VT").

He concedes that IBM and Apple compete directly in the area of servers. He does not deny that

he possesses IBM's trade secrets and confidential information. And he does not deny that, if

those trade secrets and confidential information are disclosed to a competitor, IBM will be

irreparably harmed. Nonetheless, Mr. Papermaster argues that he has not breached the

Noncompetition Agreement because, due to "significant differences between IBM's business

(focused on large-scale machines for businesses) and Apple's business (focused on consumer-

oriented electronics)," IBM and Apple do not compete in a meaningful way. (Opp'n at 1, 14.)

Mr. Papermaster's attempt to distinguish between "large-scale" and "consumer"

electronics misses the point. In fact, electronic devices—large and small—are powered by the

same type of intelligence, the microprocessor. (Supp. Adkins Decl. ¶ 4.) And to build

microprocessors, designers use, among other things, an architecture such as IBM's "Power"

architecture, concerning which Mr. Papermaster was IBM's top expert. (*Id.* ¶ 5.) And although

IBM uses "Power" architecture to make microprocessors for larger-scale machines, IBM also

makes microprocessors for consumer electronics using that same architecture. (*Id.* ¶ 6.)

Thus, Mr. Papermaster's argument that there is no risk that he will ever utilize or

disclose IBM's trade secrets (Opp'n at 14) is not credible. That argument also fails to

acknowledge that, whether or not he will compromise IBM's secrets, Mr. Papermaster is seeking

to avoid keeping the promise he made when he assumed a leadership role at IBM.

Having spent much of his 26-year career at IBM learning and developing trade secrets

used to design microprocessors suitable for many applications, including consumer electronics, Mr. Papermaster—whose title at Apple will be Senior Vice President of Devices Hardware Engineering—cannot credibly claim that he was merely hired for his "dynamic personality and leadership qualities." (Lambert Decl. ¶ 11.) Indeed, despite counsel's careful efforts to paint Mr. Papermaster as semi-illiterate about "iPod and iPhone technology" (Opp'n at 1) and to describe his responsibilities at Apple as not requiring him to "lead" (*id.* at 8) or "manag[e]" (Papermaster Decl. ¶ 21) Apple's server business or its microprocessor design subsidiary (which uses "Power" architecture), the handful of redacted documents that were cherry-picked to help Mr. Papermaster in court belie those claims. In fact, they demonstrate that Mr. Papermaster was recruited <u>precisely because</u> (1) he is "immensely smart about microprocessor design" (Lambert Decl. Ex. 1 at 1); (2) he is "spot on in systems and semiconductors" (*id.*); (3) he has "deep technical skills in the semiconductor business" (Lambert Decl. Ex. 2 at 1); (4) he "ran the microprocessor design group at IBM" (*id.* at 2); and (5) he is "sharp on the systems/semiconductor side" (*id.*).

IBM has no desire to interfere with Mr. Papermaster's professional goals, and has tried very hard to avoid this confrontation. Indeed, IBM offered to give Mr. Papermaster a full year of paid leave to ensure that he honored the Noncompetition Agreement. But IBM has a vital interest in enforcing the Noncompetition Agreement, which only a few hundred—the Company's key strategic leaders—of its nearly 400,000 employees are asked to sign, and in safeguarding the trade secrets that are key to IBM's continued success.

**Argument**

## I.    IBM and Apple Are Competitors.

There can be no doubt that Apple and IBM are competitors. Indeed, Mr. Papermaster admits that IBM and Apple compete in the sale of servers. (Opp'n at 2 n.1.) Because IBM has

shown that the Noncompetition Agreement is reasonable in duration and geographical scope (*see* IBM Br. at 12-15), the admitted existence of competition—and Mr. Papermaster's contractual admission that a violation of his agreement would cause IBM irreparable injury (MacDonald Decl. Ex. 1 § 3)—should be the end of the matter. Yet Mr. Papermaster argues that IBM and Apple do not compete meaningfully, based on a purported distinction between IBM's focus ("large, complex computer servers designed for business use") and Apple's ("consumer electronics"). (Opp'n at 1.) That purported distinction, however, cannot justify Mr. Papermaster's breach of his promises to IBM.

Large and small electronic devices require the intelligence of a microprocessor. (Supp. Adkins Decl. ¶ 9.) And IBM's "Power" architecture—in which Mr. Papermaster was IBM's top expert until 10 days ago—is crucial to the design of semiconductors devices for servers <u>and</u> consumer electronics, including embedded microprocessors that are smaller in size and more energy-efficient. (*Id.*) Indeed, although it does not possess rights to many IBM trade secrets that Mr. Papermaster has mastered, the semiconductor company that Apple acquired recently, P.A. Semi, has had to license from IBM basic aspects of the "Power" architecture to make embedded microprocessors. (Adkins Decl. ¶ 24.)

Thus, although IBM certainly develops and manufactures large, complex machines, that is of little relevance here. What <u>is</u> relevant is that IBM's Systems and Technology Group, in which Mr. Papermaster was an executive, is also focused more generally on "[s]emiconductor design and manufacturing . . . for sale to external clients." (Connelly Decl. Ex. B at 4; *id.* at 3 (IBM "provides leading semiconductor technology").) Indeed, in portions of IBM's 2007 Annual Report that Mr. Papermaster did not submit to the Court, IBM noted its investments and "leadership position in the design of smaller, faster and energy-efficient semiconductor devices." (Supp. Madsen Decl. Ex. 1, 2007 IBM 10-K at 7.) And using IBM's trade secrets, which

Mr. Papermaster knows inside-and-out, IBM has long offered, and is developing with the intent of commercializing, microprocessors for consumer electronics, including microprocessors suitable for incorporation in Apple's iPods and iPhones. (Supp. Adkins Decl. ¶ 8 & Exs. 1-3.)[1]

In sum, because IBM offers, and competes with, microprocessors that power the very type of consumer electronics Mr. Papermaster will be responsible for "develop[ing]" at Apple (Opp'n at 1, 7, 8), the centerpiece of Mr. Papermaster's defense does not withstand scrutiny. Notably, Apple, which used to buy its personal computer chips from IBM and is currently buying iPod and iPhone chips from Intel (a major IBM competitor), has publicly announced its intention to use its P.A. Semi subsidiary "to do system-on-chips for iPhones and iPods." (Adkins Decl. ¶ 23 (quoting Apple's CEO, Steven Jobs).) That is competition—with IBM and IBM's microprocessor customers.

## II.    IBM Will Suffer Irreparable Harm if Preliminary Relief Is Not Entered.

Although Mr. Papermaster seems to concede that IBM would suffer irreparable injury from a breach of the nonsolicitation covenants, he argues that a breach of the noncompetition covenants would not cause IBM irreparable harm.[2]  Aside from the anomalous position that his

---

[1] Mr. Papermaster's reliance on a 2004 interview with IBM's Chairman and CEO Samuel J. Palmisano (Connelly Decl. Ex. C) is not persuasive.  IBM's "focus[]" (Opp'n at 2) may well be in the area of "business solutions," but IBM maintains a significant presence in the area of components for consumer electronics.  Indeed, just earlier this year, IBM revealed that it had developed a type of memory device that will enable an iPod—and other competing MP3 devices—to store 500,000 songs, about 12 times more than the capacity of Apple's then-most capacious iPod.  (Supp. Adkins Decl. ¶ 8 & Ex. 3.)  This new type of memory would also cost far less to produce, would run on a single battery charge for weeks at a time and would last for decades.  (*Id.*)

[2] The two cases Mr. Papermaster relies on most heavily to argue that IBM would not suffer irreparable harm are inapposite.  In the first case, the plaintiff company provided "no evidence" (1) that defendant had access to the allegedly confidential information, (2) that the company "regarded th[at] information as secret or made any effort to preserve [its] secrecy," (3) that the information belonged to the company, and/or even (4) that the information existed.  *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979 (PKL), U.S. Dist. Lexis 22964, at *13-17 (S.D.N.Y. Mar. 28, 2007).  In the other case, the court found that "even if" the defendant's new position fell within the terms of the non-compete agreement, which was unlikely on the specific facts of that case, the plaintiff could not establish irreparable harm because the defendant

move to Apple would cause IBM no harm, but his recruitment of others would, the excuses Mr. Papermaster makes for dishonoring his promises are simply wrong.

Mr. Papermaster faults IBM for treating him respectfully once learning about his intention to join Apple, and suggests that, after employing him for 26-years, IBM should have told him promptly upon learning of that plan to "clean out his office," "turn in his keys" and "stay home." (Opp'n at 12.) Those assertions are unwarranted—and irrelevant. Even if IBM had taken all those steps, it would still be in the same position today. Long before Apple approached Mr. Papermaster, he had established himself as IBM's top expert in microprocessor design based on "Power" architecture. (Adkins Decl. ¶ 11.) Thus, short of erasing his memory, nothing IBM could have done would have prevented Mr. Papermaster from walking away with IBM's trade secrets. Moreover, although Mr. Papermaster, by his own admission, told IBM on October 20, 2008 that he "would discuss the issue with [his] wife" and "agreed to give [IBM] a reply the next day" (Papermaster Decl. ¶ 27), he had in fact signed an employment contract with Apple five days earlier (*id.* Ex. 4). In light of his own actions, it is frankly unfair for Mr. Papermaster to fault IBM for treating him respectfully.

Mr. Papermaster also argues that, although IBM has had no discovery, IBM cannot now prove that "any trade secrets have <u>actually</u> been misappropriated." (Opp'n at 14 (emphasis in original).) But evidence of actual misappropriation is not a prerequisite to a finding of irreparable harm. Such harm can be—and often is—based upon a finding that there is a high likelihood of disclosure. *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 179 (S.D.N.Y. 2006).

---

worked elsewhere in the industry for 16 years in comparable positions, worked for the plaintiff for just 11 months, had only a "generalized level of input" on technical matters and provided editorial services that were neither "unique" nor "extraordinary." *See Earthweb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 316 (S.D.N.Y. 1999). The facts of those cases bear no meaningful resemblance to the facts of this case.

Mr. Papermaster's conclusory assertion that "[n]othing about his new role [at Apple] will implicate any trade secrets of IBM" (Opp'n at 1) is belied even by the handful of heavily redacted Apple emails he has submitted to the Court. In those emails, several senior Apple executives candidly admit that Apple wanted to hire Mr. Papermaster precisely because of his expertise with microprocessor design.[3] And although Mr. Papermaster—IBM's top expert in microprocessor design based on "Power" architecture (Adkins Decl. ¶ 11)—claims that he will need to "learn the iPod and iPhone technology 'on the job'" (Opp'n at 1), those documents tell a different story—

- Timothy Cook, Chief Operating Officer:

  Mr. Papermaster has "<u>deep technical skills in the semiconductor business</u>." (Lambert Decl. Ex. 2 at 1 (emphasis added).)

- Robert Mansfield, Senior Vice President of Macintosh Hardware Engineering:

  Mr. Papermaster "fits the bill w[ith ]r[espect ]t[o] systems and <u>semiconductor understanding</u>" [*i.e.*, knowledge of microprocessor circuitry]. (Lambert Decl. Ex. 1 at 3 (emphasis added).)

  "[Y]ou will find [Mr. Papermaster] to be <u>immensely smart about microprocessor design</u>, large systems, and semiconductors." (*Id.* at 1 (emphasis added).)

- Danielle Lambert, Vice President of Human Resources:

  "You mentioned Mark being <u>spot on</u> in systems and <u>semiconductor understanding</u>." (*Id.* (emphasis added).)

---

[3] IBM is not alone in its belief. Multiple industry experts with no interest in this litigation have reached the same conclusion. (*See, e.g.*, Supp. Madsen Decl. Ex. 2, Tom Krazit, *Apple Hires Top IBM Chip Designer and Blade Server Guru*, CNet News, Oct. 30, 2008 ("As an extremely well-respected figure in the clubby world of chip design, Papermaster might also be stepping in to lead Apple's chip design efforts."); Ex. 3, Steven Burke, *Five Reasons IBM Is Scared of Losing Exec to Apple*, The Channel Wire, Oct. 31, 2008 ("Put Papermaster side by side with P.A. Semi founder . . . and you've instantly got a processor design powerhouse poised to design and build new processors that could power the next generation of iPhone and T1."); Ex. 4, Prince McLean, *Apple Recruits Top Chip Designer, IBM Responds with Suit*, AppleInsider, Oct. 30, 2008 ("As was the case with PA Semi, the hiring of Papermaster is most likely an effort to build Apple's brain trust in chip development. The expert team . . . assembled at PA Semi is certainly familiar with IBM's PowerPC technologies already, but Papermaster could provide broader expertise . . . .").)

> "[Mr.] Papermaster . . . <u>ran the microprocessor design group</u> at IBM . . . He is said to be <u>sharp on the systems/semiconductor side</u>." (Lambert Decl. Ex. 2 at 2 (emphasis added).)[4]

In fact, as Mr. Cook (Apple's COO) noted before this litigation began, Mr. Papermaster's "largest challenge in leading iPod" would <u>not</u> be a technical gap—indeed, as noted, Mr. Papermaster's technical skills were precisely what Apple was looking for—but "that he would not have consumer experience, ie fast product cycles." (Lambert Decl. Ex. 2 at 1.)

Thus, Mr. Papermaster's carefully-worded assertion that he could "'fulfill his new job responsibilities' regarding iPods and iPhones 'without utilizing the trade secrets of [IBM]' <u>regarding servers</u>" (Opp'n at 15 (emphasis added)) is neither credible nor relevant. The trade secrets whose disclosure IBM most fears are <u>not</u> specific to servers. (Adkins Supp. Decl. ¶ 9.) And Mr. Papermaster's "immense[]" expertise "about microprocessor design" (Lambert Decl. Ex. 1 at 3) is equally applicable outside the area of servers. (Adkins Supp. Decl. ¶ 9.)

Finally, having just represented to Apple that disclosure of Apple's confidential information would cause Apple "irreparable harm" (*see* Papermaster Decl. Ex. 5 § 5), Mr. Papermaster argues that similar representations he made to his former employer of 26 years should simply be ignored. (Opp'n at 13.) However, the Second Circuit has held that such representations are tantamount to "an admission . . . that plaintiff will suffer irreparable harm were he to breach the . . . non-compete." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). On the record before the Court, Mr. Papermaster should be held to his word.

---

[4] Not surprisingly, the other individuals Apple considered hiring "that fit [the criteria] asked for" by Apple's Vice President of Human Resources (Lambert Decl. Ex. 1 at 2) had skills in the same area (*id.* at 3 (describing other applicants as a "CTO [who] is very technical, <u>loves the technology and chips</u> [and] has been involved in a lot of technology;" "<u>very chip centric, got a very solid chip design</u>/semiconductor background;" "very <u>tuned into designing systems and silicon</u>") (emphases added)).

**III.    IBM Is Likely to Prevail on the Merits.**

IBM is likely to prevail on the merits.  Defendant's contrary arguments fail.

Mr. Papermaster's initial assertions—that he has not breached the Noncompetition Agreement because Apple is neither a "Business Enterprise" nor a "significant" or "major" competitor (Opp'n at 18-21)—do not withstand scrutiny.  As noted, Mr. Papermaster <u>admits</u> that IBM and Apple compete in the sale of servers.  Moreover, as Apple's internal emails acknowledge, Mr. Papermaster was hired precisely because of his expertise in microprocessors—a major portion of IBM's business.  And his role at Apple, if successful, will clearly impact IBM's microprocessor business.  (*See supra* Section I.)  Notably, and not surprisingly, third-party industry analysts have recognized that Apple and IBM compete. (Supp. Madsen Decl. Ex. 5, Hoovers Report at 10; Ex. 6, Merrill Lynch Report at 16, Chart 23.)

The Noncompetition Agreement is narrowly-tailored to protect IBM's legitimate business interests.  And despite Mr. Papermaster's attempts to demean the agreement as a "form" contract (Opp'n at 22), IBM asks only a few hundred of its nearly 400,000 employees to sign such an agreement.  (MacDonald Decl. ¶¶ 4, 10.)  IBM does not sue its former employees lightly, but a violation of the Noncompetition Agreement can inflict such severe damage on IBM that it must enforce that agreement where, as here, it is plainly being violated.[5]

Mr. Papermaster's arguments that the Noncompetition Agreement is unreasonable in scope and duration are also wrong.  The duration of the noncompetition covenants—one year— is reasonable.  Indeed, New York state and federal courts routinely uphold covenants of longer duration.  (*See* IBM Br. at 13.)  Mr. Papermaster's speculation that, if he is forced to forego working for a competitor of IBM for one year, he would sustain "a crippling blow to his career"

---

[5] IBM has successfully enforced the provisions of the agreement in jurisdictions not known for their solicitousness of employers' interests, such as the Netherlands.  (Supp. Madsen Decl. Ex. 7.)

(Opp'n at 22) is also not credible. After a 26-year career with IBM, and having just been hired by Apple as a senior vice president after a 10-month courtship (Papermaster Decl. ¶ 16; Mansfield Decl. ¶ 10), it is simply not the case that Mr. Papermaster—an "extremely well-respected figure in the clubby world of chip design" (*see supra* n.3)—would have trouble finding employment. Mr. Papermaster will not lose in 12 months the qualities for which Apple allegedly hired him. (Lambert Decl. ¶ 16 ("[H]e has strong general engineering skills, is an outstanding leader, and . . . will be a good cultural match at Apple.").)

The geographical scope of the noncompetition covenants is similarly reasonable. While Mr. Papermaster lives in Texas,[6] during the last 12 months of his employment he had global responsibilities at a company that competes globally. (Connelly Decl. Ex. B at 1.) The handling of trade secrets that have extraordinary value anywhere on the planet was a routine part of Mr. Papermaster's job. As such, the geographical scope of the covenants is reasonable, as IBM noted in its opening brief. (IBM Br. at 13 (quoting 17A C.J.S. Contracts § 266).) [7]

Finally, IBM is likely to prevail on its claim to enforce the nonsolicitation covenants. Mr. Papermaster does not deny that those covenants are reasonable in duration and geographical scope, nor does he identify any harm that he would suffer if he is held to his promises. Instead, Mr. Papermaster argues that—7 days after he left IBM—there is "no evidence that Mr. Papermaster has ever attempted to solicit anyone." (Opp'n at 23.) There is no

---

[6] In a footnote, Mr. Papermaster asserts that he may wish to raise a personal jurisdiction defense and take the position that New York law does not apply to IBM's claims. Suffice it to say that Mr. Papermaster has contractually agreed to submit to this Court's jurisdiction and that New York law governs the Noncompetition Agreement. (*See* IBM Br. at 9 n.3.)

[7] In any event, Mr. Papermaster's argument that the covenant is too broad because it would preclude him from working "anywhere on Earth" (Opp'n at 22) is a red herring because New York courts can "blue pencil" a covenant to make it reasonable. *BDO Seidman v. Hirschberg*, 93 N.Y.2d 382, 394-95 (1999). And no matter how narrowly the Court chose to construe the covenant, it is clear that Mr. Papermaster's new job with Apple will require Mr. Papermaster to be in breach of it.

requirement under the law that IBM supply such proof.  As Ms. Lambert notes, however, in hiring Mr. Papermaster, Apple wanted to obtain someone "able to attract the best young engineers to work on [Apple's] product[s]."  (Lambert Decl. ¶ 8.)  Having already exposed IBM to the threat of irreparable harm through his own departure, Mr. Papermaster—a former member of IBM's 50-person Technical Leadership Team (Papermaster Decl. ¶ 12)—should be prevented from doing so again through solicitation efforts.

## IV.     Alternatively, IBM Has Raised Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Decidedly Tips in IBM's Favor.

At a minimum, preliminary injunctive relief is appropriate because IBM is threatened with irreparable harm, there are sufficiently serious questions going to the merits of the dispute and the balance of hardships decidedly favors IBM.

There is no reason to believe that Mr. Papermaster's new job, which was offered to him after a 10-month recruitment effort, could not wait while the merits of this dispute are resolved. Mr. Papermaster only asserts that "preventing [him] from performing his new job would <u>risk</u> costing him a once in a lifetime opportunity."  (Opp'n at 24 (emphasis added).)  And, indeed, Apple announced just today that the executive Mr. Papermaster would be replacing will remain employed at Apple in an advisory role.  (Supp. Madsen Decl. Ex. 8.)  While IBM does not believe that, consistent with his obligations to IBM, Mr. Papermaster can today perform the responsibilities he has accepted at Apple, IBM is willing to proceed on an expedited schedule (and to secure the preliminary injunction) to ensure that this matter reaches a final determination on whatever schedule the Court sets, while preserving the critical status quo.

## Conclusion

For the reasons set forth above, IBM respectfully requests that the Court issue a preliminary injunction enforcing the Noncompetition Agreement.

November 4, 2008

CRAVATH, SWAINE & MOORE LLP

by

Evan R. Chesler
(EChesler@Cravath.com)
Stephen S. Madsen
(SMadsen@Cravath.com)
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff International Business
Machines Corporation*