# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**OFFICE COPY**



NOV 17 2008

**S.D. OF N.Y.**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                    Plaintiff,

          -against-

MARK D. PAPERMASTER,

                    Defendant.

7:08-cv-09078 (KMK)

**NOTICE OF APPEAL**



NOV 17 2008

**S.D. OF N.Y.**

Notice is hereby given that Mark D. Papermaster, defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from this Court's order granting Plaintiff's Motion for Preliminary Injunction entered in this action on the 7th day of November, 2008, and the opinion setting forth the Court's findings of fact and conclusions of law in connection therewith dated the 14th day of November, 2008.

LATHAM & WATKINS LLP

By: _____

Blair G. Connelly
885 Third Avenue
New York, NY 10022-4802
Tel.: (212) 906-1200
Fax: (212) 751-4864

-and-

Timothy B. Hardwicke *(admitted pro hac vice)*
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 876-7619
Fax: (312) 993-9767

Attorneys for Defendant-Appellant

To:     Evan R. Chesler
Stephen S. Madsen
Cravath, Swain & Moore LLP
825 Eighth Avenue
New York, New York 10019
Tel: (212) 474-1000
Fax: (212) 474-3700

Attorneys for Plaintiff-Appellee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                          Plaintiff,                    Case No. 08-CV-9078 (KMK)

          -v-                                           ORDER

MARK D. PAPERMASTER,

                          Defendant.

KENNETH M. KARAS, District Judge:

    For reasons that will be stated in a forthcoming Opinion, Plaintiff's Motion for
Preliminary Injunctive Relief is GRANTED. It is further

    ORDERED that Defendant, Mark D. Papermaster, will immediately cease his
employment with Apple Inc. until further Order of this Court; and it is further

    ORDERED, pursuant to Fed. R. Civ. P. 65(c), that Plaintiff is required to propose a
reasonable bond, after consultation with Defendant, to the Court by 4:00 p.m. on November 10,
2008. If Defendant objects, he shall submit his opposition by 4:00 p.m. on November 11, 2008;
and it is further

ORDERED that the Court will hold a status conference on November 18, 2008, at 10:00

a.m., at which it will discuss, and encourages the Parties to discuss beforehand, an expedited

schedule for discovery and trial.

SO ORDERED.

Dated:        November 7, 2008
              White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                             Plaintiff,

     -v-

MARK D. PAPERMASTER,

                           Defendant.

Case No. 08-CV-9078 (KMK)

OPINION AND ORDER

Appearances:

Evan R. Chesler, Esq.
Stephen S. Madsen, Esq.
Cravath, Swaine & Moore LLP
New York, New York
*Counsel for Plaintiff*

Blair G. Connelly, Esq.
Latham & Watkins, LLP
New York, New York
*Counsel for Defendant*

Timothy B. Hardwicke, Esq.
Latham & Watkins, LLP
Chicago, Illinois
*Counsel for Defendant*

KENNETH M. KARAS, District Judge

      Before the Court in this diversity action is the application of Plaintiff International

Business Machines Corporation ("Plaintiff" or "IBM"), for an order pursuant to Rule 65 of the

Federal Rules of Civil Procedure to enjoin Defendant Mark D. Papermaster ("Defendant" or

"Papermaster"), a former IBM executive, from working for, and from disclosing IBM's

confidential information to, Apple Inc. ("Apple").

of products, including microprocessors and servers." (*Id.* ¶ 8.) Microprocessors are "a type of microelectronic device that provides intelligence and functionality to electronic devices, such as personal computers, video game consoles, intelligent handheld devices and servers." (*Id.*) "Servers are high-performance computers designed to handle the needs of multiple, concurrent users." (*Id.*)

To build these servers and microprocessors, IBM has developed what is known as "Power" architecture, which is based on a "broad array of know-how and/or technical instructions used to design electronic devices." (Supplemental Decl. of Rodney C. Adkins ("Suppl. Adkins Decl.") ¶ 5 n.1.) From IBM's perspective, "Power" is "one of the handful of architectures used to design, develop and manufacture microprocessors for both large and small electronic devices." (*Id.* ¶ 5.) And, as evidenced by its use in a wide variety of applications, it is said to "be superior to other architectures in its scalability, its flexibility and its ability to be customized . . . ." (*Id.*)

While IBM's model emphasizes large-scale products for businesses, (Decl. of Blair G. Connelly, Ex. C), the microprocessor technology developed by IBM has wide application, (Decl. of Rodney C. Adkins ("Adkins Decl.") ¶ 10; Suppl. Adkins Decl. ¶ 5). For example, within the last 18 months, IBM has developed technology that is compatible with consumer electronic products such as cellphones and MP3 players. (Suppl. Adkins Decl. ¶ 8.) In particular, IBM recently revealed a new type of digital storage technology that enables MP3 players (such as Apple's iPod) to store about half a million songs or 3,500 films with a lower power output. (*Id.* ¶ 8.c.) And, until two years ago, IBM supplied Apple with microprocessors, based on its

3

"Power" architecture, for Apple's personal computers. (*Id.* ¶ 7.)[1]

B. Mr. Papermaster's 26-Year Career at IBM

Mr. Papermaster, a Texas resident, has worked at IBM for the past twenty-six years.

(Decl. of Mark D. Papermaster ("Papermaster Decl.") ¶¶ 1, 5.) He has spent most of his career

at IBM in various product design and development roles within the "Systems and Technology

Group." (Adkins Decl. ¶ 7.)[2] From 1991 until 2006, Mr. Papermaster worked in microprocessor

technology development, eventually becoming IBM's Vice President of Microprocessor

Technology Development. (Papermaster Decl. ¶ 7.) Most of Mr. Papermaster's work in

microprocessors has been focused on IBM's "Power" architecture, and because of his extensive

work in this area he is viewed within IBM as the "top expert" in "Power" architecture (Compl.

¶ 14), and in the industry as "an extremely well-respected figure in the clubby world of chip

design," (Supplemental Decl. of Stephen C. Madsen ("Suppl. Madsen Decl."), Ex. 2 (Tom

Krazit, *Apple Hires Top IBM Chip Designer and Blade Server Guru*, CNet News, Oct. 30,

2008)). Most of Mr. Papermaster's work in microprocessors has involved server applications,

but he spent approximately five years working on microprocessor applications for personal

computers. (Papermaster Decl. ¶ 7.) In fact, IBM has a separate Vice President in

---

[1] IBM sold its personal computer business to the Lenovo Group in 2005, but it claims that it continues to have an equity investment in that business and to sell personal computers when sales of these items accompanies technical service transactions. (Adkins Decl. ¶ 19.) IBM claims to have generated "substantial revenue" from such sales. (*Id.*)

[2] The Systems and Technology Group "is the IBM business that provides the Company's clients with a wide range of business solutions to advanced computing and technical data storage needs." (Adkins Decl. ¶ 4.) It is this group that designs and manufactures, among other things, microprocessors and servers. (*Id.*) In addition to the Systems and Technology Group, IBM's other major groups include a Global Technology Services segment, a Global Business Services segment, a Software segment, and a Global Financing segment. (Adkins Decl. ¶ 3.)

4

microprocessor design to run IBM's microprocessor development efforts for consumer electronics and embedded products. (*Id.*)[1]

From October 2006 until his departure from IBM on October 24, 2008, Mr. Papermaster served as Vice President of IBM's Blade Development Unit, a unit within the Systems and Technology Group, which designs and delivers IBM's "blade" servers. (Adkins Decl. ¶ 11; Papermaster Decl. ¶ 6; Compl. ¶ 15.) A "blade" is a "small, thin server that fits into [a] 'rack' or 'chassis' with other 'blades' forming a system IBM calls [a] 'BladeCenter.'" (Adkins Decl. ¶ 11 n.1.) Each blade is a server unto itself and is often dedicated to a single application. (Papermaster Decl. ¶ 6.) The blade servers, which are not consumer products, were first introduced in 2002. (*Id.*)

Mr. Papermaster describes himself as having developed a "strong reputation" at IBM for his "ability to lead large teams on complex projects." (Papermaster Decl. ¶ 3.) He believes that he is perceived as having "strong technology management skills to bring together technical experts and enable them to integrate on specific product developments." (*Id.*) IBM apparently shared Mr. Papermaster's view, as it selected Mr. Papermaster to be a member of the Integration & Values Team ("I&VT") at IBM, an elite group that develops IBM's corporate strategy. (Compl. ¶¶ 10-11.) The I&VT consists of approximately 300 top IBM executives who are

---

[1] According to Mr. Papermaster, there are three "common categories for microprocessor applications: (1) microprocessors for business enterprise applications such as servers; (2) microprocessors for personal computing and gaming; and (3) those 'embedded' in other machines, such as automobiles, telephones, and appliances." (Papermaster Decl. ¶ 7.) Further, according to Mr. Papermaster, each of these three categories "drives a different design with different capability, power consumption, and circuit techniques." (*Id.*) Mr. Papermaster acknowledges having worked in two of the three categories of microprocessors – servers and personal computing. (*Id.*)

5

considered to be its key leaders. (Decl. of J. Randall MacDonald ("MacDonald Decl.") ¶ 4.) In

fact, the members of this elite group are appointed by the Chairperson of IBM and include the

CEO and all twenty of the company's senior executives. (*Id.*) As a member of the I&VT, Mr.

Papermaster had access to highly confidential information, including strategic plans, marketing

plans, product development, and long-term business opportunities for IBM. (*Id.* ¶ 7; Adkins

Decl. ¶ 13.) Defendant states that during his time at IBM, he attended four I&VT meetings and

only recalls reviewing materials once. (Papermaster Decl. ¶¶ 8-10.)

   In addition to his participation on the I&VT, Mr. Papermaster served on the Technical

Leadership Team ("TLT"), which is comprised of IBM's top technical leaders and works to

attract, develop, and retain a talented and diverse technical workforce. (MacDonald Decl. ¶ 11.)

As a member of the TLT, Mr. Papermaster had access to confidential information concerning

IBM's technical talent "pipeline," technical organizational capabilities, and technical recruitment

strategies, all of which are part of IBM's corporate strategy development and are highly

confidential. (*Id.*) In fact, the information made available to TLT members is not made

available to most IBM employees, let alone the public. (*Id.*) Mr. Papermaster claims that he

does not "believe that [he] learned any trade secret information that would be useful to [him] or

Apple" from his participation in the TLT. (Papermaster Decl. ¶ 12.)

  <u>C. The Noncompetition Agreement</u>

   On June 21, 2006, as a prerequisite to his membership in the I&VT and in return for

consideration to him, Mr. Papermaster executed a Noncompetition Agreement. The

Noncompetition Agreement contains a provision that: "during [Mr. Papermaster's] employment

with IBM and for one (1) year following the termination of [his] employment . . . [Mr.

6

Papermaster] will not directly or indirectly within the 'Restricted Area' (I) 'Engage in or

Associate with' (a) any 'Business Enterprise' or (b) any significant competitor or major

competitor of the Company." (Compl. ¶ 19; Noncompetition Agreement § 1(b).)  In the

Noncompetition Agreement, the following are key defined terms:

- "Restricted Area" is defined as "any geographic area in the world for which [Mr. Papermaster] had job responsibilities during the last twelve (12) months of [his] employment with the Company." (Compl. ¶ 20; Noncompetition Agreement § 2(d).)

- "Engage or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, . . . or otherwise." (Compl. ¶ 21; Noncompetition Agreement § 2(c).)

- "Business Enterprise" is defined as "any entity that engages in . . . competition with the business units or divisions of the Company in which [Mr. Papermaster] worked at any time during the two (2) year period prior to the termination of [his] employment. (Compl. ¶ 22; Noncompetition Agreement § 2(a).)

Mr. Papermaster also agreed to a nonsolicitation covenant that: "during [his]

employment with IBM and for one (1) year following the termination of [his] employment . . .

[he] will not directly or indirectly within the 'Restricted Area' . . . solicit, for competitive

business purposes, any customer of the Company with which [he was] involved as part of [his]

job responsibilities during the last twelve (12) months of [his] employment with the Company"

and "for the two (2) year period following the termination of [his] employment . . . [he] will not

directly or indirectly within the 'Restricted Area,' hire, solicit or make an offer to any employee

of the Company to be employed or perform services outside of the Company." (Compl. ¶ 23;

Noncompetition Agreement § 1(b).)

In executing the Noncompetition Agreement, Mr. Papermaster also made several

acknowledgments, including that:

7

- "the business in which IBM and its affiliates . . . are engaged is intensely competitive" (Compl. ¶ 24; Noncompetition Agreement § 1(a));

- "[his] employment by IBM has required, . . . that [he] have access to, and knowledge of, confidential information of the Company, including but not limited to, certain or all of the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company, all of which are of vital importance to the success of the Company's business" (Compl. ¶ 24; Noncompetition Agreement § 1(a));

- "[his] services to the Company are, and will continue to be, extraordinary, special and unique" (Compl. ¶ 24; Noncompetition Agreement § 1(a));

- "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (Compl. ¶ 24; Noncompetition Agreement § 3);

- "the restrictions set forth [in the covenants] are reasonable as to geography, duration and scope" (Compl. ¶ 24; Noncompetition Agreement § 3).

D.  Apple and Its Recruiting of Mr. Papermaster

Apple, which is headquartered in California, designs, manufactures, and markets personal computers, portable digital music players, mobile communication devices, and a variety of related software, services, peripherals, and networking solutions. (Papermaster Decl. ¶ 14.) Two of Apple's many consumer products are the iPod and the iPhone. (Decl. of Robert Mansfield ("Mansfield Decl.") ¶ 2.) Apple also sells servers, its top line is known as the "Xserve," although sales of these products account for only ____ of Apple's annual revenues. (Mansfield Decl. ¶ 3.) Mr. Papermaster claims that other than the divested personal computer business that IBM had, and "a single sale several years ago of Apple's Xserve product to a university," he does "not recall a single instance of Apple being described as a competitor of IBM during" his tenure at IBM. (Papermaster Decl. ¶ 15.) On the other hand, the record

8

contains third-party industry analyses demonstrating that, in fact, IBM and Apple are viewed as competitors, as are IBM and other electronics companies that sell products to Apple, such as Intel. (Suppl. Madsen Decl. Ex. 5 (Hoovers Report at 10); Ex. 6 (Merrill Lynch Report at 16, Chart 23).)

In April 2008, Apple acquired P.A. Semi, a microchip design company in California with which IBM competes in the microprocessor field. (Adkins Decl. ¶ 20.) In fact, as noted above, until 2006, Apple utilized IBM's PowerPC microprocessors, which are based on IBM's "Power" architecture, in Apple's personal computers (*id.*), and Apple contemplated using P.A. Semi's microprocessors in lieu of IBM microprocessors. (Adkins Decl. ¶ 20.) Moreover, P.A. Semi is believed to be developing microprocessors suitable for video gaming applications, another area of potential competition with IBM. (*Id.* ¶ 21.)[4] Most relevant to this litigation, Apple's CEO, Steven Jobs, has commented that "P.A. Semi is going to do system-on-chips for iPhones and iPods." (*Id.* ¶ 23; Suppl. Madsen Decl., Ex. 2 (Tom Krazit, *Apple Hires Top IBM Chip Designer and Blade Server Guru*, CNet News, Oct. 30, 2008 (noting that Mr. Jobs told The New York Times that "P.A. Semi would be used to build chips for the iPhone and iPod Touch.")).)

In October 2007, Apple began a search for an executive in the consumer electronics field to serve under the current Senior Vice President, iPod Division, and to become the successor in that role. (Decl. of Danielle Lambert ("Lambert Decl.") ¶ 5.) For the following five months, Apple interviewed several candidates, including Mr. Papermaster, but did not find anybody to

---

[4] Prior to its acquisition by Apple, P.A. Semi was a licensee of IBM. (Adkins Decl. ¶ 24.) However, after the Apple acquisition, IBM limited the license to prohibit P.A. Semi from using IBM's "Power" architecture in new microprocessor lines. (*Id.*) In any event, there is evidence in the record demonstrating that Mr. Papermaster's knowledge of IBM's microprocessor technology exceeds that of P.A. Semi. (*Id.*)

fill the position. (*Id.*) As part of its search for the right candidate, Apple sought the input of some of its senior management. One individual whose views were solicited was Bob Mansfield, who serves as Senior Vice President of MacIntosh ("Mac") Hardware Engineering at Apple and is a former IBM executive. (Lambert Decl. ¶ 6.) Mr. Mansfield noted, in internal emails in January 2008, that Mr. Papermaster "fits the bill [with respect to] systems and semiconductor understanding, but in every other way is a long shot" and that Mr. Papermaster is "immensely smart about microprocessor design, large systems, and semiconductors." (Lambert Decl., Ex. 1.) Mr. Mansfield also commented that because Mr. Papermaster had not had "the benefit of an education outside of IBM," he was "worried about the differences in pace of development, etc[.], but not overly worried." (*Id.*)[5] Notwithstanding Mr. Mansfield's supportive comments, Apple elected not to offer the position to Mr. Papermaster, instead offering him, in February or March 2008, a position in "developing the hardware for products in the area of personal computers." (Lambert Decl. ¶ 10.)[6]

In September 2008, following the release of the new iPod and iPhone, Apple renewed its efforts to find a successor to the Senior Vice President for the iPod/iPhone Division. (*Id.* ¶ 11.) Whatever led Apple to decide not to offer Mr. Papermaster the position earlier in 2008, apparently did not prevent it from re-interviewing Mr. Papermaster in October 2008. (*Id.* ¶ 12.)

_____

[5] Mr. Mansfield sent this email in response to an email from Danielle Lambert, the Vice President of Human Resources at Apple. In her email to Mr. Mansfield, Ms. Lambert wrote that Mr. Mansfield had mentioned that Mr. Papermaster was "spot on in systems and semiconductor understanding," but that he may be "off in other ways." (Lambert Decl., Ex. 1.)

[6] The precise date of Apple's first offer to Mr. Papermaster is not clear, but Mr. Papermaster describes it as occurring "several weeks" after his February 2008 interview. (Papermaster Decl. ¶ 17.)

10

Thus, Mr. Papermaster interviewed with Apple again, and on October 10, 2008, Apple offered

Mr. Papermaster a position in the iPod/iPhone Division as Senior Vice President, Device

Hardware Engineering, which he promptly accepted. (*Id.* ¶ 13.) In this position, Mr.

Papermaster will report to Mr. Jobs. (Papermaster Decl. ¶ 19.) At the time of the offer, Apple

asked Mr. Papermaster to keep the offer confidential and not to disclose the position he would be

assuming at Apple, in which he would manage the development of consumer electronics

products, specifically the iPod and iPhone. (Papermaster Decl. ¶¶ 18, 20.)

On October 13, 2008, Mr. Papermaster informed his superiors at IBM that he intended to

accept a position at Apple that would begin sometime in November. (MacDonald Decl. ¶ 13;

Papermaster Decl. ¶ 25.) Evidently, Mr. Papermaster did not tell IBM officials of his acceptance

of Apple's offer, as on October 20, 2008, in an effort to persuade Mr. Papermaster to remain at

IBM, the company offered him either a substantial increase in compensation to stay at IBM or

one year's salary in exchange for his agreement not to work at Apple for one year. (MacDonald

Decl. ¶ 15-16.) At that time, IBM informed Mr. Papermaster that acceptance of Apple's offer

would violate the Noncompetition Agreement he had signed. (Papermaster Decl. ¶ 27.) Mr.

Papermaster informed IBM that he needed time to consider the offer, but he submitted his

resignation the next day, and his last day of employment was October 24, 2008. (Compl. ¶ 42;

Papermaster Decl. ¶ 30.)

On October 15, 2008, without IBM's knowledge, Mr. Papermaster signed an

Employment Agreement with Apple. (Papermaster Decl., Ex. 4.) Mr. Papermaster also signed

an Intellectual Property Agreement, which contained a provision acknowledging his agreement

to "not improperly use or disclose to Apple any confidential, or proprietary, or secret information

11

of [his] former employers or any other person" and not to "bring any confidential, proprietary or secret information of [his] former employer(s) or any other person(s) onto Apple property." (Papermaster Decl., Ex. 5.)  At the preliminary injunction hearing, Mr. Papermaster's counsel indicated that Mr. Papermaster began his employment at Apple on November 3, 2008, a fact which IBM was not aware of until the preliminary injunction hearing, thus prompting IBM to request a temporary restraining order.

II.  Discussion

### A.  Standard of Review

"A preliminary injunction is 'an extraordinary and drastic remedy,'" *Int'l Creative Mgmt., Inc. v. Abate*, No. 07-CV-1979, 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007) (quoting *Med. Soc'y of State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977)), and is "'one of the most drastic tools in the arsenal of judicial remedies,'" *id.* (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)).  "'To obtain a preliminary injunction a party must demonstrate: (1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'" *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348-49 (2d Cir. 2003)).[7]

---

[7] Plaintiff claims that a choice of law provision provides that the Noncompetition Agreement will be governed by New York law.  (Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mem.") 9.)  Defendant, although applying New York law in his response papers, notes that he does not concede that New York is the applicable choice of law for the underlying dispute because he resides in Texas, and Apple is located in California.  (Def. Mark D. Papermaster's Mem. of Law in Opp. to Pl.'s Mot. for Prelim. Inj. ("Def.'s Mem.") 11 n.2.)  For purposes of this application for injunctive relief, the Court will apply New York law, while

12

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d. Cir. 1983)). To demonstrate irreparable injury, the movant must show "an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages." *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) ("Irreparable harm is an injury for which a monetary award cannot be adequate compensation." (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995))). "In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated." *Int'l Creative Mgmt.*, 2007 WL 950092, at *2.

### B. Irreparable Harm

IBM claims that Mr. Papermaster possesses trade secrets and other sensitive information and that there is a substantial risk of Mr. Papermaster disclosing this information to IBM's detriment. Further, IBM argues that Mr. Papermaster has already acknowledged that a breach of the Noncompetition Agreement would irreparably harm IBM. (*See* Noncompetition Agreement § 3 ("You acknowledge that the Company would suffer *irreparable harm* if you fail to comply with [the Agreement], and that the Company would be entitled to any appropriate relief, including . . . equitable relief." (emphasis added)).)

New York courts define a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to

---

recognizing that Defendant claims the right to address this issue in the future.

obtain an advantage over competitors who do not know or use it." *N. Atl. Instruments v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (internal quotation marks omitted). Courts routinely have noted that it is "very difficult to calculate the monetary damages that would successfully redress the loss" associated with trade secret misappropriation. *Estee Lauder*, 430 F. Supp. 2d at 174; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages."); *Natsource*, 151 F. Supp. 2d at 469 (noting "that it is generally not possible to calculate monetary damages if an employee violates a non-compete clause" (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999))). To determine whether information constitutes a trade secret, the courts consider the following factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. v. Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993)).

Where a court finds that an employee is in possession of trade secret information, the court must still determine whether that employee has actually misappropriated the information or whether the new employment "creates a risk that disclosure of this information is inevitable." *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007). Here, although there is no proof that Defendant has actually misappropriated trade secrets (particularly given that he was at Apple for only five days before the injunction issued), Plaintiff argues that

14

there is a substantial risk that he will do so in his new employment. Factors that guide a court in making the determination that disclosure of trade secrets is inevitable include: "(1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets." *Payment Alliance Int'l*, 530 F. Supp. 2d at 482 (internal quotation marks and citations omitted); *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999) (same). Thus, "[e]ven where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed, where . . . the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning [] marketing strategies, or the like." *Estee Lauder*, 430 F. Supp. at 174 (internal quotation marks omitted and alterations in original). In this analysis, the existence of the Noncompetition Agreement is highly relevant. *See Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 188-89 (N.D.N.Y. 2005) ("In cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury.").

Here, Mr. Papermaster is fully aware of many of IBM's most sensitive trade secrets, and he does not claim otherwise. He worked for years with some of the crown jewels of IBM's

15

technology, including its "Power" architecture. This well-developed blueprint, which has been jealously guarded and promoted by IBM, is used to design microprocessors for large (i.e., servers) and small (i.e., cellphones and MP3 players) devices, and it gives IBM a leg up in the competitive world of electronics components. Moreover, Mr. Papermaster has been exposed to other sensitive and confidential information through his work as a member of the I&VT and TLT group, such as strategic plans, product development, technical recruitment, and long-term business opportunities for IBM, all of which is information that is disclosed to a select few within the company.

Because Mr. Papermaster has been inculcated with some of IBM's most sensitive and closely-guarded technical and strategic secrets, it is no great leap for the Court to find that Plaintiff has met its burden of showing a likelihood of irreparable harm. To begin, IBM has amply demonstrated that its business strategy continues to be the development of cutting-edge microprocessors that have application across the full spectrum of electronics products. Of course, the Court recognizes that IBM does not sell MP3 players or cellphones that compete with the iPod or the iPhone. But, IBM does sell the microprocessor technology that provides the electronic brains for those products and competes for that business. To profit from the manufacture and sales of such microprocessors, IBM relies heavily on its "Power" architecture, and has employed Mr. Papermaster as its top expert in the development and application of that technology.

It is conceded that Mr. Papermaster has spent the last two years working on a product, the blade server, that competes directly with Apple's "Xserve," and this alone establishes that IBM and Apple directly compete. Mr. Papermaster, however, has not been hired by Apple to work on

the "Xserve." Thus, it is no more helpful to IBM's case that Apple sells servers than it is to Mr. Papermaster's case when he says that he will not use his server knowledge in his new job at Apple. However, Mr. Papermaster has been given the title of "Senior Vice President, Device Hardware Engineering," and will work on the iPod and the iPhone, products that the Court takes judicial notice are critical to Apple's financial success. (*See, e.g.*, Press Release, *Apple Reports Fourth Quarter Results* (Oct. 21, 2008), http://www.apple.com/pr/library/2008/10/21results.html (noting revenue growth related to iPod and iPhone products and quoting Mr. Jobs as stating, "Apple just reported one of the best quarters in its history, with a spectacular performance by the iPhone . . . .").) Little has been said about the precise responsibilities that this title entails, or what Mr. Papermaster's average day would look like. But, his counsel represented to the Court at the preliminary injunction hearing that Mr. Papermaster will be responsible for the "P&L" of the iPod and iPhone. In other words, Mr. Papermaster has not been wooed to Apple merely to head up sales and marketing, or to run Apple's human resources department, for example. Instead, he has been hired specifically to help Apple make these two critical products more profitable. To do that, it is obvious that Mr. Papermaster will be responsible for improving these products, that is, to make sure that they store more information, do it more quickly, and use less power in doing so.

It cannot be disputed that iPods and iPhones are powered by microprocessors, and any improvement in the speed, storage, and power capabilities of those devices depends on improvements in microprocessor design. IBM's business includes the development of microprocessors for consumer electronics. (*See* Suppl. Madsen Decl., Ex. 1 (2007 IBM form 10-K), at 7 (noting IBM's "leadership position in the design of smaller, faster and energy-efficient

semiconductor devices").)[8] Thus, it is likely that Mr. Papermaster inevitably will draw upon his experience and expertise in microprocessors and the "Power" architecture, which he gained from his many years at IBM, and which Apple found so impressive, to make sure that the iPod and iPhone are fitted with the best available microprocessor technology and at a lower cost. Indeed, any claim that he would merely use general engineering skills is belied by Apple's focus on Mr. Papermaster's "spot on" knowledge of semiconductors and microprocessor design. (Lambert Decl., Ex. 1.) Yet, by drawing upon IBM-developed proprietary information in these fields, Mr. Papermaster will harm in unquantifiable ways IBM's ability to compete for the sale of products that could be used in the iPods and iPhones of the future, thus improperly placing Mr. Papermaster in direct competition with his former employer. *See Estee Lauder*, 430 F. Supp. 2d at 179 (noting that irreparable harm may be established where there is a substantial risk that the defendant will disclose trade secret information); *Global Switching Inc. v. Kasper*, No. 06-CV-412, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) (finding irreparable harm where the plaintiff established that its former employee would be working in direct competition with it); *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 630 (E.D.N.Y. 1996) (finding irreparable harm where employee was a "member of the elite strategic planning committee" and therefore "privy to discussions" involving marketing strategy and product lines).

Two other facts make the likelihood of irreparable harm to IBM more than mere speculation. First, Mr. Papermaster has acknowledged that IBM would suffer "irreparable harm" if he violated the Noncompetition Agreement. (Noncompetition Agreement, § 3.) The Second

---

[8]For example, IBM has developed new storage technology that allows iPods and other MP3 players to store more data at a lower cost. (Suppl. Adkins Decl. ¶ 8, Ex. 3.)

18

Circuit has recognized that employment contracts which internally acknowledge such harm "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision." *Ticor Title Ins.*, 173 F.3d at 69; *accord Estee Lauder*, 430 F. Supp. 2d at 174. While, there is "no authority indicating that such a contract provision entitles a plaintiff to a *per se* finding of irreparable harm," *Int'l Creative Mgmt.*, 2007 WL 950092, at *6, "the explicit provision in the agreement" and "common sense" indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that Mr. Papermaster carries in his head, *Global Telesys., Inc. v. KPNQWest, N.V.*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001).

The second critical fact that underscores the likely threat to IBM from Mr. Papermaster's new job is Apple's purchase of P.A. Semi, a microchip company based in Apple's home state, subsequent to its initial decision not to hire Mr. Papermaster to run the iPod/iPhone Division. After Apple purchased P.A. Semi, but before it hired Mr. Papermaster to head up the iPod/iPhone Division, Apple revealed that it was going to have P.A. Semi "do system-on-chips for iPhones and iPods." (Adkins Decl. ¶ 23.) In other words, Apple announced its intention to have P.A. Semi develop the very type of product that IBM sells to the market generally, and would like to sell to companies like Apple. Several months thereafter, Apple, for reasons that Mr. Papermaster has not explained, changed its mind about Mr. Papermaster's credentials and hired him to run the iPod/iPhone Division.[9] The Court accepts that Mr. Papermaster will not be

---

[9]This sequence of events undercuts Mr. Papermaster's claim that he was merely a "Plan B" hire. The theory proffered by Defendant is that Apple initially sought to hire, during the supposed "Plan A" phase of the search process, an executive with consumer electronics experience. This process began in October 2007 and lasted for five months thereafter. (Lambert Decl. ¶ 5.) Only after this phase, the Court is told, did Apple go to Plan B and interview other

"managing P.A. Semi assets in [his] role at Apple," or "developing the microprocessors that are used in iPod and IPhone products," and that he will procure microprocessors from outside his "group." However, Mr. Papermaster will be responsible for improving and developing the iPod and iPhone, which necessarily will require him to make decisions about what type of microprocessor technology to use in these products. And, while he may procure such technology outside of his "group," his boss has suggested that the source for this technology, while technically out of Mr. Papermaster's group, could be P.A. Semi, an Apple subsidiary that competes directly with IBM. Given that Apple hired Mr. Papermaster, at least in part, because of his chip expertise, it no doubt expects him to use this specialized knowledge to determine the technical specifications for the electronic brains of the products he will oversee. Again, it is inconceivable that Mr. Papermaster will not draw upon his IBM experiences in making those decisions.[10]

---

candidates, including Mr. Papermaster, with "managerial and leadership skills necessary to lead" the iPod/iPhone Division. (*Id.*)

Yet, the evidence shows that, in fact, Apple received favorable information about Mr. Papermaster in early January 2008 and interviewed him in February 2008. After that interview, however, Apple did not offer Mr. Papermaster the position in the iPod/iPhone Division, and instead offered him a job in the personal computer area (this despite his asserted lack of knowledge in consumer electronics). Mr. Papermaster has provided little information regarding Plan B, including any internal documents about why Apple determined that Mr. Papermaster was not suitable for the position in the iPod/iPhone Division in February 2008, but that he was in October 2008.

[10]Mr. Papermaster notes that he has signed an Intellectual Property Agreement with Apple that prevents him from disclosing to Apple any confidential information he gained while working at IBM. However, Mr. Papermaster made similar promises in the Noncompetition Agreement he signed with IBM, and, in any event, his subsequent agreement with Apple does not blunt the risk of his inevitable disclosure of IBM's confidential information. *See Estee Lauder*, 430 F. Supp. 2d at 176 (noting that the defendant's stipulation that he would not provide trade secrets did not remove the threat of irreparable injury to the plaintiff).

20

In suggesting that Apple's hiring of Mr. Papermaster threatens IBM with irreparable injury, the Court does not mean to suggest that Mr. Papermaster has intentionally acted dishonorably. While his decision not to tell IBM on October 13, 2008 that he already had accepted Apple's offer or that he intended to start at Apple on November 3, 2008 are both curious, the Court has no evidence before it that Mr. Papermaster has disclosed any IBM trade secrets to date. The harm to IBM, however, is more likely to derive from inadvertent disclosure of the IBM trade secrets that have defined Mr. Papermaster's long career. Put another way, what other base of technical know-how could Mr. Papermaster draw upon to perform his new and important job? Thus, while the Court ascribes no ill-will to Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM. *See Payment Alliance Int'l*, 530 F. Supp. at 482 ("[E]ven if [the defendant] acted with the best of intentions, he [might] unintentionally transmit information gained through his [former employer] during his day to day contact with his new employer." (internal quotation marks omitted)); *Verizon Commc'ns Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 659 (E.D. Pa. 2006) (examining non-compete agreement under New York law and finding that because the defendant was working for a direct competitor, it "would strain credulity beyond the breaking point" that the defendant would not "consciously or unconsciously share or draw on insights" gained from his work at his prior employer); *Lumex*, 919 F. Supp. at 632 (finding risk of inevitable disclosure where the defendant was going to work for a competitor and noting that the defendant could not "eradicate [the] trade secrets and [the] confidential information from his mind"); *Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984) (where the defendant had extensive knowledge of the plaintiff's technology, the court found

21

disclosure to be "likely, if not inevitable and inadvertent, if [the defendant] commence[d] employment with [her new employer]").[11]

## C. Likelihood of Success on the Merits

"The issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area." *Ticor Title Ins.*, 173 F.3d at 69; *accord Payment Alliance Int'l*, 530 F. Supp. 2d at 484 ("It is well established under New York law that restrictive covenants in employment agreements are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." (internal quotation marks omitted)). "Because of strong public policy militating against the sanctioning of a person's loss of the ability to earn a livelihood, New York law subjects a non-compete covenant by an employee to an overriding limitation of reasonableness which hinges on the facts of each case." *Ticor Title Ins.*, 173 F.3d at 70 (internal quotation marks omitted).

The Court finds that the restriction in the Noncompetition Agreement is "very limited in time" and that the nature of IBM's business "requires that the restriction be unlimited in geographic scope." *See Natsource LLC*, 151 F. Supp. 2d at 471-72; *see also Estee Lauder*, 430

---

[11] Because the Court finds that Plaintiff has met its burden of showing irreparable harm by establishing the likely risk of inevitable disclosure, the Court finds unpersuasive Defendant's argument that if IBM actually had been concerned over the risk that he would divulge trade secrets, it would not have allowed him a two-week transition at IBM, during which time he could have saved files, copied records, and taken other steps to misappropriate IBM's trade secrets. IBM reacted the way it did to Mr. Papermaster's disclosure of the Apple offer because it did not know, until three days before his departure, that he had, in fact, accepted Apple's offer on October 10, 2008 and had a start date of November 3, 2008. IBM's reasonable efforts to persuade Mr. Papermaster to remain with IBM hardly are grounds for concluding that there is no risk of inevitable disclosure of IBM's trade secrets should Mr. Papermaster work for Apple.

F. Supp. 2d at 181 (upholding worldwide limitation); *Johnson Controls*, 323 F. Supp. 2d at 534 (finding one-year duration of covenant not unreasonably long). In addition to establishing his technical know-how and expertise, IBM has shown that Mr. Papermaster, as a member of the I&VT and TLT, has extensive knowledge concerning IBM's strategic plans and business forecasts, all of which are legitimately protected by the Noncompetition Agreement. *See Lumex*, 919 F. Supp. at 630 (noting employer's interest in enforcing noncompetition agreement when employee attended meetings of a strategic planning committee where marketing and other business plans were discussed). As a result, the Court finds that Plaintiff has established that the trade secrets that Defendant has been exposed to during his long tenure at IBM are likely to remain competitively valuable to IBM and its competitors for more than a year. *See Verizon Commc'ns*, 462 F. Supp. 2d at 661 (noting that the "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential business information will be competitively valuable").

If a covenant by an employee not to compete survives the "reasonableness" test, then enforcement will be granted to the extent necessary: "(1) to prevent an employee's solicitation or disclosure of trade secrets; (2) to prevent an employee's release of confidential information regarding the employer's customers; or (3) in those cases where the employee's services to the employer are deemed special or unique." *Ticor Title Ins.*, 173 F.3d at 70; *accord Global Switching Inc.*, 2006 WL 1800001, at *15 (same). Thus, "New York law strikes a balance by permitting companies to protect their management from being lured to competitors only to the extent necessary to prevent the misuse of trade secrets." *Estee Lauder*, 430 F. Supp. 2d at 179.

The Noncompetition Agreement restricts Mr. Papermaster from working for any

23

"Business Enterprise," which includes, "any entity that engages in . . . competition with the business units or divisions of the Company in which [Defendant] worked at any time during the two (2) year period prior to the termination of [his] employment." (Noncompetition Agreement § 2(a).) While Mr. Papermaster technically is in violation of this provision based on his work in IBM's Blade Development Unit, because Apple's "Xserve" line competes with IBM's blade servers, this is not the heart of Mr. Papermaster's potential breach. Instead, Mr. Papermaster's breach of the Noncompetition Agreement is due to the fact that Apple is an "entity" that "engages in competition with" the Systems and Technology Group at IBM. As noted above, this Group, which includes the Blade Development Unit that Mr. Papermaster worked in between October 2006 and 2008 and other units in which Mr. Papermaster has worked, develops and manufactures the microprocessors that IBM markets to Apple and others competing with IBM for Apple's business. And, because of its acquisition of P.A. Semi, Apple competes directly with the Systems and Technology Group in the chip market. Thus, the Court finds that IBM is likely to succeed on the claim that Mr. Papermaster's employment with Apple violates the Noncompetition Agreement.

The Noncompetition Agreement further prohibits Mr. Papermaster from working for "any significant competitor." For the reasons outlined above, the Court finds that Apple is a significant competitor of IBM and, because of Mr. Papermaster's expertise, it is likely that enforcement of the Noncompetition Agreement is necessary to prevent his disclosure of trade secrets. In particular, IBM persuasively argues that Mr. Papermaster's knowledge of the IBM "Power" architecture is "unique" and "irreplaceable," a fact that Mr. Papermaster himself acknowledged in his Noncompetition Agreement. (Noncompetition Agreement § 1(a).) As a

24

result, IBM would be at a disadvantage were Mr. Papermaster to use this information while at Apple, even if he were not directly involved in the development or design of microprocessors at Apple. *See Ticor Title Ins.*, 173 F.3d at 72 (holding that "injunctive relief is available to enforce a covenant not to compete" where the employee's services are "special unique or extraordinary . . . if the covenant is reasonable, and even though competition does not involve disclosure of trade secrets . . . ." (omitting internal quotations marks)); *Natsource*, 151 F. Supp. 2d at 474 (finding restriction necessary where employee's skill was of a level that could not be duplicated easily and where employer would be greatly harmed if employee were allowed to compete against employer); *Bus. Intelligence Servs.*, 580 F. Supp. at 1073 ("[The defendant] is not directly involved in the development or design of new programs but has information which could be useful in such an undertaking. Within a year, her knowledge of these matters will be outdated and of little use. Prior to that time disclosure of [the defendant's] knowledge to [her new employer] would harm [the plaintiff] and provide a competitive advantage to [her employer].").

For the foregoing reasons, the Court finds that the Noncompetition Agreement is reasonable in duration and geographic scope, and it is necessary to prevent the disclosure of IBM's trade secrets. Thus, it is probable that IBM will prevail on the merits of its claims for specific performance of the Noncompetition Agreement.

## D. Balance of Hardships

In the alternative, IBM has established that there are sufficiently serious questions going to the merits of its claims, and that the balance of hardships is decidedly tipped in its favor.

In New York, courts view employment restrictive covenants with suspicion "because enforcement of employee restrictive covenants may result in the loss of an individual's

25

livelihood." *Global Switching Inc.*, 2006 WL 1800001, at *15; *Natsource LLC*, 151 F. Supp. 2d at 472 (noting that a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood" (internal quotation marks omitted)). Here, the Court recognizes that enforcement of the Noncompetition Agreement will work a hardship on Mr. Papermaster. Indeed, Mr. Papermaster has indicated that the position at Apple is a once-in-a-lifetime opportunity for him, as it will involve significantly more responsibility and higher compensation. (Papermaster Decl. ¶ 19.) On the other hand, at the hearing and in its moving papers, IBM acknowledged that it did not lightly sue its former employee. Further, the Court recognizes that it is difficult, if not impossible, to calculate the monetary damages that would compensate IBM for the disclosure of the sensitive trade secrets at issue in this case, given the difficulty of assessing how much of a competitive advantage such confidential information could provide to Apple. *See Estee Lauder*, 430 F. Supp. 2d at 174.

IBM's intellectual property is its most valuable asset, and, in this case, Mr. Papermaster is a "top expert" in one of IBM's key areas of technical know-how. Mr. Papermaster also has been given access to sensitive strategic information. Further, the Court notes that, before it knew that Mr. Papermaster already had accepted Apple's offer, IBM offered to increase Mr. Papermaster's salary to stay employed at IBM, or to pay him a year's salary merely not to work for Apple. IBM also warned Defendant that his acceptance of Apple's offer would constitute a violation of the Noncompetition Agreement. *See Estee Lauder*, 430 F. Supp. 2d at 182 (finding that the fact that Estee Lauder had contracted to pay the defendant his salary for the duration of the scope of the non-compete clause assuaged the hardship to him, especially since he could still

26

work in a non-competitive position).  Thus, while the Court accepts Mr. Papermaster's view that his offer from Apple represented a once-in-a-lifetime opportunity, Mr. Papermaster also must accept the obligations he undertook when he became a top executive at IBM.  Accordingly, the Court finds that IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple, and, as a result, the balance of hardship tips decidedly in IBM's favor.

## III.  Conclusion

For the foregoing reasons, IBM has established irreparable harm and serious questions going to the merits, if not the likelihood of success on the merits, and that the balance of hardships tips decidedly in its favor.  As a result, the Court grants IBM's motion for a preliminarily injunction.  However, the Court recognizes that the best way to fairly ensure that both Parties' equities are protected "is to have them determined finally as quickly as possible." *See FMC Corp.*, 730 F.2d at 64.  As a result, the Court has ordered that an expedited discovery schedule be arranged and that the trial take place as soon as practicable after discovery is completed.  This schedule will be discussed at a conference on November 18, 2008, at 10:00 a.m.

Because the Parties both have expressed concern about publicly filing in their entirety the submissions related to the preliminary injunction, the Court will file this Opinion under seal to

ensure that no sensitive information is improperly disclosed. However, the Parties are to advise the Court by November 19, 2008, what, if any, redactions should be made before the Court publicly files this Opinion.

SO ORDERED.

Dated: November 14, 2008
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

28

Service List

Evan R. Chesler, Esq.
Stephen S. Madsen, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Tel: (212) 474-1000
Fax: (212) 474-3700
Email: echesler@cravath.com
       smadsen@cravath.com
*Counsel for Plaintiff*

Blair G. Connelly, Esq.
Latham & Watkins, LLP
885 Third Avenue
New York, NY 10022-4834
Tel: (212) 906-1658
Fax: (212) 751-4864
Email: blair.connelly@lw.com
*Counsel for Defendant*

Timothy B. Hardwicke, Esq.
Latham & Watkins, LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
*Counsel for Defendant*

29

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

               Plaintiff,

      -against-

MARK D. PAPERMASTER,

               Defendant.

08 Civ. 9078 (KMK)

**CERTIFICATE OF SERVICE**

       I, Jessica L. Bengels, hereby certify that on Thursday, November 20, 2008, a true and correct copy of the Notice of Appeal dated 11/20/08, was caused to be served in accordance with the Federal Rules of Civil Procedure, via First Class United States mail delivery upon:

Evan R. Chesler, Esq.
Stephen S. Madsin, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
*Counsel for Plaintiff*

Dated:  November 20, 2008
         New York, New York

LATHAM & WATKINS LLP

By:        _____
           Jessica L. Bengels

885 Third Avenue
New York, New York  10022
Telephone: (212) 906-1200
*Counsel for Defendant*